FERDINAND H. FINK et al. v. EXECUTOR OF J. D. FINK.

| 12 | 301 |
| 51 | 543 |
| 12 | 301 |
| 52 | 89 |
| 12 | 301 |
| 123 | 121 |
| 123 | 952 |

The will of the testator *John D. Fink*, of New Orleans, contained the following clause:

" *That after the payment of my just debts and the legacies mentioned herein above mentioned, that the proceeds of the whole of my estate, property, rights, effects and credits be applied to the erection and maintenance and support of a suitable asylum in this city, to be used solely as an asylum for protestant widows and orphans, to be called Fink's Asylum : and I do hereby authorize my friend Diederich Bullerdieck, after my decease, to name and appoint three worthy and responsible persons as trustees to carry out my said intentions respecting the aforesaid asylum.*"

It was *held* that the widows and orphans for whom it was intended the building to be erected should be a refuge and a home, were the objects of the testator's bounty.

The clause in the will in reference to the appointment of trustees, is to be construed as a delegation by the testator to a third person of the choice of administrators of a portion of the estate, and this clause is a mere nullity, and is to be considered as not written. C. C. 1506, 1566.

The words " Protestant widows and orphans" used in the will, taken in connection with other words, indicate with certainty the meaning to have been " Protestant widows and orphans in the city of New Orleans."

The general form of expression used by the testator, as to the objects of his benevolence, is sanctioned by the Article 1536 of the Civil Code, which sanctions a donation to the *poor of a community*, and the word community in this Article means a municipal corporation.

The qualification " Protestant" of the nouns-substantive widows and orphans, is not so vague as to vitiate the bequest. It will be for the administrators of this charity to determine what widows and what orphans come under the denomination of " Protestant."

The Article 1586 of the Code, which provides that donations made for the benefit of the poor of a community shall be accepted by the administrators of such community, although found under the head of donations *inter vivos* is applicable to donations *mortis causa*.

The corporation formed by the title of the Fink Asylum since the death of the testator is without interest.

The charity created by the testator's will is legally to be administered only by the city corporation of New Orleans.

APPEAL from the Second District Court of New Orleans, *Morgan*, J. *Preaux & Derbès*, for plaintiff:

The will itself shows that the heir was not in existence at the time of the death of the testator. The testator says " It is my wish and desire, and I do hereby declare the same to be my will, that after the payment of my just debts, and the several legacies herein above mentioned, that the proceeds of the whole of my estate, property, rights, effects and credits, be applied to the *erection* and maintenance and support of a suitable asylum in this city, to be used solely as an asylum for Protestant widows and orphans, *to be called* " *Fink's Asylum:*" *and I do hereby request and authorize my friend, Diederich Bullerdieck, after my decease, to name and appoint three worthy and responsible persons as trustees, to carry out my said intentions respecting the aforesaid asylum.*"

We have copied here the entire dispositions of the will in order to render its discussion more sensible.

The words " *to be applied to the erection*" show clearly that the instituted heir was not yet in existence at the time of the drawing of the instrument, and that the institution was made in favor of a body, whose creation was contemplated by the testator to take effect only after his death. Therefore upon the first proposition there can be no difficulty, so far as the question of the existence of the heir at the time of the death of the testator is concerned.

Then, in order to inherit, one of the essential conditions is, *to be in existence at the time of the death of the testator*, and this essential condition of the law is missing in the institution.

The Art. 1469 C. C. saith : " In order to be capable of receiving by last will, it suffices to be conceived at the time of the decease."

Toullier, vol. 5, p. 100, No. 92, says:

" Pour recevoir , *même sous condition*, il faut exister ; on ne saurait donner

FINK
v.
FINK.

à celui qui n'est pas *in rerum natura,* si ce n'est dans le cas des substitutions autorisées par les Art. 1048 et 1049, qui permettent de donner à l'un de ses enfants, ou bien à l'un de ses frères ou sœurs, à la charge au donataire de rendre à ses enfans nés ou *à naître.* HORS, CES DEUX CAS EST CELUI DE L'ART. 1082, *dont nous parlerons au chap.* 8. IL FAUT EXISTER POUR RECEVOIR, MEME SOUS CONDITION."

The 8th chap. of the work of Toullier, treats of donations by marriage contract. The above authority is surely conclusive on the subject, and we can say without fear of being contradicted, that the author may have equals among some few of the commentators of the Napoleon Code, but surely he has no superior.

Our laws have shown all kinds of liberality in requiring only that the heir be conceived at the time of the death of the testator, in order to enable him to inherit. It seems that the courts ought to take care not to give more extension to the laws than the liberality of the legislator has given to it.

The requisites of the Roman law were more severe. See L. 49, § 1, *de heredibus.* L. 1, *D. de regulâ Catoniâ.*

See Merlin Rep. verbo Institution d'Héritier, Sec. VI, No. V.

There is one fact upon which we desire to call your honor's attention. In *Fink's* will, the asylum is not instituted, for the reason that its creation must take place by an act which will happen after the death of the testator, therefore, at the moment of the decease of the testator, we find no conceived heir, (or no heir in existence so far as it relates to corporation.)

The language of the Art. 418, C. C., is clear: "Corporations, for certain purposes, are considered as natural persons, and, therefore, in the transaction of their business, subject to the same rules as those which govern natural persons."

The authors of the C. C., in Art. 424, in specifying the capacity of corporations, say : That they " are substituted to persons ;" they may possess property, receive by way of donations and legacy, also by way of testament. But the Art. 424 C. C., leaves no room for a doubt, that in order to be capable of receiving, they must be first created before the liberality, or the institution is made in their favor.

" In Art. 1536, C. C., in which the legislator speaks of donations made for the benefit of an hospital, his language is not ambiguous ; he speaks of a body in existence at the time of the act of donation. Again, in Art. 1474, in speaking of the dispositions which the law authorizes a father to make in favor of his natural children, the Legislature contemplates institutions made in favor of an heir conceived. In all its dispositions in relation to corporations, the Code says no where, that the dispositions of Art. 1469 C. C., are not applicable to corporations ; on the contrary, the language of the legislator places them on an equal footing with natural persons. Therefore, the inflexible rule of Art. 1469 C. C., is as well applicable to them as to natural persons ; they must be *conceived at the time of the decease of the testator.*

Therefore, the pretended Fink's Asylum, being not in such a situation cannot inherit.

The Art. 1469, C. C., requires that in order to be able to inherit, the heir must be conceived at the time of the death of the testator, which means that he must have at any rate, a gestative existence in the womb of his mother. If he is not in such a condition, the institution cannot inure to him.

Then, in supposing that instead of instituting the pretended asylum as his universal legatee, *Fink* had said that the executor would have to appoint three trustees, for the purpose of selecting an infant born at the time of the appointment of said trustees, and to give to him as christian name that of *Fink,* and that the infant thus selected and named, would be the universal legatee of the testator. Could such a disposition be maintained by any tribunal ?

Then, is it not the same disposition, so far as the pretended asylum is concerned ? It suffices to read the institution contained in the will, in order to say yes.

Then, as we have demonstrated in treating the second proposition so far as the right of heirship is concerned, corporations, in the limits of their attributes, are placed on an equal footing with natural persons ; it follows from this, that such a disposition elapsing to a natural person, ought to elapse to the pretended asylum.

It is too often forgotten, that the legislator, in his acts, intends only to give help to laudable disinterested charitable purposes, but that his intention has never been to furnish relief for vanity and unreasonable self respect.

If a citizen is animated by the pure desire of endowing charitable institutions, the laws of Louisiana afford to him ample means for carrying into effect his good will, but if he only intends to satisfy his vanity, and so sacrifice his legitimate relations, the legislator has refused to him such an authority, because in all civilized society, family ties are as much necessary and holy for the support of the government, as charity.   17 L. R. 46 ; 18 L. R. 246.

The testator says, that it is his wish and desire, that after his death the re-·mainder of his property be applied to the *erection of an asylum to be called Fink's Asylum*, and he charges his executor *to appoint and name three worthy and responsible persons as trustees, to carry out his intentions.*

Let us suppose that the testator is still alive, in making such a disposition by way of a donation *inter vivos* without the grant of the sovereign, would he have been divested of his title of property?   And could it make this corporation pretend to any legal existence as a corporation ?   Surely no.   Because no corporation can be established, except by a positive grant on the part of the sovereign.

But *Fink* is dead.   Does that change the position ?   Surely no, because in his power of disposing by testament, he was bound to act agreeably to the laws of the country.   See C. C., Art. 1505.

The Art. 423 C. C., requires the authority of the Legislature to establish a corporation, and if *Fink* had been alive he could not have established said pretended corporation.   He could not even have established it alone in recurring to the general laws in matters of ·corporations.   (See Acts of 1855, 185.)

But it may be said, that the title is vested in an intellectual body, because the testator, in his will, had the idea of the creation of the body.   But the answer to that odjection is very simple.   The instituted heir, in the language of Art. 1469 C. C., must be conceived or in existence, so far as it applies to corporations, that is to say, to have a gestative existence, and that pretended asylum had not even, at the time of the death of the testator, that existence.   It is only the trustees who took upon themselves to create it.

Therefore, no intellectual body was vested, at the time of the death of *Fink*, with the right to inherit his property.

The executor and the trustees are not instituted heirs by the terms of the will, and no natural persons or corporations remain vested, by the will, of the right of heirship.

Consequently, there is no person vested with the right of heirship, and the testator must be considered as having died *ab intestat* so far as the disposition of his will is concerned.

Beyond a doubt, *Fink*, in his will, has made no legal disposition, so far as the pretended asylum is concerned.   C. C. 1566.

But if any disposition can be found in said instrument by meticulous minds, it is null and void, because it cannot be ranked under any shape, except under that of a *fidei commissa.*

*Bullerdieck* is appointed by virtue of the will, not the heir, but only the testamentary executor of the deceased.

The Art. 1651 C. C., says: " That the execution of the dispositions contained in testaments, is usually confided by the testator to one or more testamentary executors."

Then your honors perceive that the duty of a testamentary executor is confined by law to a mere power of execution, and that the testator has no authority by virtue of the law to entrust said executor with the power of creating the heir. The will and the institution, the heir and the capacity of the heir to inherit at the time of the death of the testator, must be accomplished facts at the time of the death of the testator ; and the executor has no other power than to execute the legal dispositions contained in the will.

Are these requisites to be found in the will of *Fink ?*   No, the executor has to appoint and name *three worthy and responsible persons as trustees*, to CARRY OUT the intentions of the testator respecting the asylum.   Is that a mere act of execution on the part of the executor.   Is it not, on the contrary, a right of constitution ?   And can the executor constitute any portion of the will which he is charged to execute ?

FINK
v.
FINK.

These are questions for your honors to decide, and they are so simple that it seems to us they offer no difficulty and that the court will pronounce that such a disposition is not warranted by the law of Louisiana.

But by the will, the testamentary executor is vested with the seizin of the succession of the testator and also with the right of appointing the trustees, and to return to them the liberality for the purpose of *carrying into effect the intentions* of the testator, as long as the trustees are not appointed, the assets of the succession remain in the hands of the executor. The appointment of the trustees is entirely left to his own discretion, no specific time is pointed out in the will for their appointment, it must only take place "*after the death*" of the testator. It is only when they are appointed that they receive from the executor the liberality. Is not such a testamentary disposition, coming exactly under the prohibition contained in Art. 1507 C. C.? We think so.

The language of the Art. 1507 C. C. is clear, "Substitution and *fidei commissa* are and remain prohibited."

Is not an act committed to the faith of the executor by the testator, to take possession of his succession by virtue of the seizin, to appoint the trustees and to return the assets of the succession to said trustees, a *fidei commissum?*

Under the old system, in order to establish a corporation, the action of the Legislature was required. (C. C., Arts. 418 and 423). But since the adoption of the Constitution of 1812, the Constitutions of 1845 and 1852 have been adopted. New laws have been established, and a general law has been adopted agreeably to the provisions of these two last instruments. These laws are two in number, and may be found on pages 182 and 185 of the Acts of 1855.

The corporation, of the kind of those similar to that concerned in this controversy, is one of those for which "An Act entitled an Act for the organization of corporations for literary, scientific, religious and charitable purposes," (see page 185 of the Acts of 1855,) has provided.

The first section of the Act requires seven persons in number, in order to be able to create said corporation. Without that number such a corporation cannot be created.

The will of *Fink* requires only the appointment of three trustees, which fact shows clearly that his intention was not to authorize his executor to seek for a remedy in that law, or that he has ever contemplated the creation of a corporation *to carry out his intentions.*

The language of that first section shows clearly that the intention of the legislator is, that these seven persons will form the corporation with a fund of their own, and not with the fund of a succession, after the death of a testator, and without the intervention of the Legislature, and against its will, for your honors ought not to forget that an application was made to the Legislature of this State by the executor for the incorporation of the pretended asylum, and that that body has disregarded the application.

*Durant & Hornor*, for Executor:

The testator's intentions are so abundantly clear, that one lays himself open to the charge of affectation in seeming not to see them. The language of the will is, "that the proceeds of his whole estate, &c., should be applied to the erection, maintenance and support of a suitable asylum in New Orleans, to be used solely as an asylum for Protestant widows and orphans;" and it would be difficult to conceive, as far as the intention goes, what language he could have adopted to express his wish more intelligibly, to provide, to the extent of his means, for the wants of a certain class of widows and orphans.

But however plainly his desire may be expressed as to its essence, the legacy is still null, say the heirs, from the omission of the testator to provide for the *manner* in which his intention shall be carried into effect.

This objection presents two distinct questions for solution:

Firstly—Is it necessary to the validity of a bequest for charitable purposes, that the testator should specify the means by which his design is to be carried out? And does the omission to do so, moreover, taint the bequest with nullity?

The authorities already quoted will suffice to show that the question must be answered negatively.

Under the jurisprudence of Rome, after the introduction of Christianity, provision was made by law for carrying out the bequests of pious persons in

favor of God, the Saviour, the saints, the poor and the fatherless. See Novell. Just. cxxxi, chap. ix, "si quis in nomine magni Dei, et salvatori nostri," &c. ; and chap. x, quoted above. And under this legislation it was, of course, unnecessary for the testator to point out the mode in which his beneficence should be carried out, which, from ignorance, he might be unable to do ; for the law stepped in, by these general provisions, to supply those means which, in the absence of general arrangements, might always have been afforded by special legislation.

See Domat, liv. iv, tit. ii, sec. vi, §4, "si un legs pieux n'avait pas de destination," &c.

The case is the same in France, and the same general provision is made in Art. 910 of the Code Napoleon.

The legislation and jurisprudence of England was placed upon the same footing by the statute of 43 Elizabeth, chap. 4 : "That the commissioners appointed by the Lord Chancellor shall inquire, &c., as to the lands, &c., given by well disposed people, &c."

And under this statute, a bequest to *charity in general* whether to be executed by trustees selected by the testator himself or by the king as *parens patriæ*, will be sustained for the purposes mentioned in the statute or embraced by its equity. See the remarks of Lord Eldon, in *Morrice* v. *The Bishop of Durham*, 10 Vesey, 541.

In Massachusetts, a legacy to *T. S. P.* and *R*, in trust for the cause of Christ, for the benefit and promotion of true evangelical piety and religion, was maintained. See *Going* v. *Emery*, 16 Pickering, 107.

Our own Code, Art. 1536, says : "Donations made for the benefit of an hospital, of the poor of a community, or of establishments of public utility, shall be accepted by the administrator of such communities or establishments."

Under this, should one make a donation to the poor of New Orleans, would the donation be void because he had not specified the mode and manner in which the poor are to receive the benefit of his bounty ? It would not, unless we entirely disregard the Article.

So when, formerly, *Joseph Claude Mary*, once a resident of this city, died in France, leaving $5,000 to the orphans of the First Municipality, the sum was ordered by this court to be paid to the First Municipality council, the court saying : "It appears to us that the city council of the First Municipality will be competent to claim and receive the legacy, and regulate its distribution among the intended objects of the testator's munificence to be found within the limits of the First Municipality."

Here was the strongest possible case against the petitioners' objection now urged. The testator said not one word, nor made the most distant allusion to the mode and manner in which he desired his intention with regard to the orphans should be carried into effect. He simply said, I give five thousand dollars *"aux orphelins de la Première Municipalité"*—nothing more. The bequest was held valid, and every principle of the law of charitable uses will sustain the decision of the court.

And so, it now stands proved, from authority and reason, that the validity of a charitable bequest does not depend upon an indication by the benefactor of the manner and mode in which his bounty is to reach the beneficiaries. See *Succession of May*, 2 Rob. 438.

Under the system of the Pandects, so little was it necessary for the testator to specify the mode and manner in which he desired his benevolent intentions to be carried out, that even when he had specified them, and they were found to be unlawful or otherwise impossible, some other mode was devised for their fulfilment, that the charity might not entirely fail. See Digest lib. xxxiii, tit. ii, p. 16—"Legatum civitati relictum est, *ut ex*," &c.

And we say, secondly, in the will now before the court, has the testator really made the omission which is here insisted upon by the petitioners as a ground of nullity ?

Two principles of great simplicity govern the construction of written instruments of this character. They have been handed down to us from the earliest records of human reason.

That the words employed shall be interpreted according to the meaning of the testator : "conditionem verba, quæ testamento prescribuntur," &c. Digest, lib. xxxv, tit. 1, p. 101, sec. 2. See *Succession of Franklin*, 7 An. 416; 4 Kent. 535. And that the interpretation should be more large and liberal than

FINK
*v.*
FINK.

in contracts. "In testamentis plenius voluntates testatium interpretantur." Digest, lib. 1, tit. 17, sec. 2.

Looking at the clause under consideration, with these principles to guide us, we find that the intention of the testator was to devote the proceeds of the residue of his estate to the establishment of an asylum; and when he said that it was to be an asylum suitable for protestant widows and orphans, what must he clearly be understood to have had in his mind? Those who seek the nullity of the will, say he must be understood as meaning nothing more than that an edifice should be built, to be called Fink's Asylum, and that his desires went no further than this. He only wanted, says the heirs, that the building should stand as a monument of his name and fame, but had no idea that the arrangements should be effected that would make it useful to the beneficiaries.

Such a construction shocks all plausibility and common sense, neither of which will tolerate the idea that a man entertains the design of making an asylum suitable for widows and orphans, without any one to manage the fund that was to support them.

The testator wishes an asylum to be "erected, maintained and supported" in New Orleans; the word "erected" is sufficient for the building, but it is also to be maintained and supported; and as this could only be done by the expenditure of the proceeds of the property he left for the purpose, and by the aid of persons to direct and manage its affairs, in general and detail, we are bound by the well-known rules of interpretation, to declare that the testator desired and meant *that* to be done which was necessary to carry his intentions into effect, which is, therefore, just as much a part of his will then as if written in it.

Desiring to erect, support and maintain an asylum in New Orleans, and he a resident of that city, we are not stretching a point when we say, there being already in existence there a number of asylums, all provided with presidents, boards of managers, matrons, nurses, watchmen, cooks, attendants, and all the staff of employees necessary to carry them on, he must be presumed to have desired an asylum under the same management as these, or he would have expressly pointed out in what respects he wished his to differ from the others.

As he says he wishes a "suitable asylum," *i. e.* an asylum suitable for widows and orphans, it may well be asked, in what way an asylum could be suitable for widows and orphans, without the corps of managers and officers by which all asylums are managed.

But, it will be said, that to attain the end of the testator, an incorporated company must be established, and that he has given no direction in his will to that effect. It may be the testator did not know that an incorporation was necessary. He may or he may not have known it. If he knew it was necessary, he certainly desired it, for he is legally presumed to have desired everything necessary to carry out his intent; and if he did not know it, and it is still necessary, then he is presumed just as much, in a legal point of view, to have desired it. In either case the same result is attained. Every man is presumed to know the law. And his having had in view at the time the various laws of this State in regard to the organization of bodies politic for any literary, religious, scientific or *charitable* purposes (see Acts 1847, p. 151; Acts 1853, p. 296; Acts 1855, p. 185) becomes, then, a matter of legal presumption. Such a corporation Fink evidently conceived; for he uses a term which is a *species* of corporation—corporation being the *genus*. *Asylum* means "an institution for the protection or relief of the unfortunate; as an *asylum* for the poor," &c. Webster's Dictionary. And an institution "is an organized society, established either by law or by the authority of individuals, for promoting any object, public or social." Webster's Dictionary.

We hence conclude that the will employs an expression equivalent precisely to a *corporation;* and there is no necessity of supplying any words to say he meant a corporation. Indeed, the words corporation and asylum are convertible terms: and either may be used in the will without impairing the intention of the testator.

In *Milne's* case, 17 L. R. 46, the testator, in so many words, directed an act of incorporation to be procured. In the matter before the court, that direction is a matter left to inference. Was the will in the former case pronounced good because the testator directed an act of incorporation to be procured? Certainly not, for his direction had no influence in the matter; the will was pronounced good because the incorporation was necessary, and had been granted by the Legislature. And in the present case the act of incorporation *is*

equally necessary, and may be granted by the same authority, as has actually been done.

Had *Milne* made a bequest to the poor of New Orleans, without saying they should be incorporated, a case which the Supreme Court considered in their opinion, (see 17 L. R. p. 46,) this omission would not have avoided the will, but either the public authorities of the parish would have been competent to receive the bequest, or the General Assembly, as *parens patriæ*, would have devised means for carrying the beneficent intention of the testator into effect. 17 La. 55.

Applying, now, the true principles of interpretation to this residuary clause, it will be found that the mode and manner in which the testator designed his intentions to be carried into effect, clearly result from the law which the testator is presumed to have had in his mind, and whose existence rendered more complete expressions on his part entirely unnecessary.

The petitioner's further object, that dispositions such as are contained in the clause of the will, are in opposition to the policy of the law; but without a more specific statement of the objection, it is scarcely possible to give it an answer. Bequests for charitable uses are favored by every known system of law, and have been cherished by the legislation of successive ages; our Code sanctions them by numerous texts, and our books of reports are filled with their approval; and were a lawyer called upon to signalize the act of man most highly favored by law, he would almost involuntarily turn to bequests for charitable purposes.

And the petitioners contend, that in a case like the present the dispositions of the will could not be carried into effect without making an entire new will for the testator. It remains to be seen what force lies in this objection.

The testator has expressed his desire, in terms the most explicit, that the proceeds of the bulk of his estate should be expended in erecting, supporting and maintaining an asylum suitable for Protestant widows and orphans. How does this disposition require an entire new will? And what more frequent is there than the foundation by will of public charities? See Dalloz Dict., verbo Etablissemens Publies; Merlin's Rep., verbo Fondation; Merlin's Rep., verbo Institution d'Héritier, sec. v, § 1, Art. 17.

In such cases the testator, as in the present, indicates the object of his bounty, and it is a function of the government of the country to carry it out, whether by the operation of general statutes provided for the purpose, as in France, or by the supervising control of an equity court, as in Great Britain and many of our sister States, or by the aid of general or special laws, as in Louisiana.

In *Bartlett* v. *Nye*, 4 Metcalf, 378, a devise of real estate to an unincorporated society for a charitable use was held valid. The estate in such case, it was said, descends to the heirs of the testator, subject to the trust created by him, which they are bound to execute, and if they do not execute it voluntarily, the court will regulate and enforce the execution.

In the will of *Julien Poydras* a legacy of twenty thousand dollars was left, the interest of which was directed to be appropriated to the maintenance of an academy in the parish of Pointe Coupée. In the theory of the petitioners' case this bequest should have been held void, for *Poydras* did not say that the academy was to be incorporated, nor did he give the legacy to a corporation, nor did he specify who should administer the fund, nor did he furnish the details for the organization of the school; and to supply all these is what the petitioners would probably call making a new will for him. The bequest was not a nullity, for the Legislature authorized the Police Jury of the parish of Pointe Coupée to accept the donation. See 2 Moreau's Dig., 208, 209; also Act of March 18, 1856, p. 111.

It would seem, therefore, that it is by no means essential to the validity of the clause of a will making a bequest for a charitable purpose, that the testator should express his desire that a corporation should be created to administer the fund, for the mode of administration is not the essence of the bequest. The Legislature, as *parens patriæ*, may use its own wisdom in this regard. It may create a corporation, or it may place the fund in charge of a corporation already established, but that the mass of the citizens should be deprived of the benefits the testator designed for them, is not to be thought of. The testator may not have known and may not have cared about the shape in which the channel was to be wrought through which his bounty was to flow; he has left this, in the

FINK
v.
FINK.

first instance, to the discretion of his executor, who, in the discharge of his trust, has thought proper to procure, in conjunction with certain persons of high trust and respectability, a charter of incorporation under the laws of the State, as the best mode of carrying out the testator's munificence.

That corporation is represented before the court, and its interests fortunately placed in abler hands than ours. But whether the executor has done well or ill is not so much the question with us now as whether the desires of the testator are in some way to be carried out.

And further, the petitioners declare that the clause of the will in question does not dispose of or transfer the property therein designated to any person or persons.

In cases of dedication of property to public use and of charitable uses, it is not necessary that any grantee should be named, or that any should be in existence, and in the meantime the fee would be in abeyance. See *Town of Paulet* v. *Clark*, 9 Cranch. 292.

In the case of *Shotwell* v. *Mott*, 2 Sandford, 46, the testator bequeathed four thousand dollars to be invested by the executors in trustees, to be by them selected, to be distributed forever, under the direction of the New York Yearly Meeting of Friends called Orthodox, unto and among such orthodox ministers of said society as the meeting might designate. The objection was there fully discussed, that trustees were not appointed in the will to hold the fund, and the objection was declared invalid. We beg the court's attention to this case, as strongly resembling the present, and as containing a copious review of all the authorities.

The clause of the will now before the court vests the possession of the property in the first place in *Bullerdieck*, the executor—that is the first transfer. It is made his duty to "name and appoint three worthy and responsible persons as trustees, to carry out the instructions of the will respecting the asylum," to whom he is to give the proceeds of the residuary bequest.

If this is a lawful direction, then we say *Bullerdieck* has complied with it, by procuring, with others, an act of incorporation, and will complete the execution of his trust by handing the proceeds to this corporation. If, however, it is an unlawful direction, it is considered as not written, and the will stands, according to law, as if no such direction were contained in it. And say, for the sake of argument, if you please, that the act of incorporation is null and void, what is the case then presented to the court? A mass of property bequeathed for charitable purposes, in the possession of an executor who administers it, waiting for the action of the Legislature as *parens patriæ* to bring into existence the machinery which will render the charity effective. The title to the property in the meanwhile is in abeyance, but cannot be claimed by the heirs, for the court cannot presume that the Legislature, by refusing to intervene, will deprive the people of New Orleans of the good the deceased intended to confer on them, and until that refusal is declared in absolute terms, the clause of the will, we submit, must stand.

We are at a loss to know what objections can be found to this clause which have not been dealt with already.

The case now before the court comes completely within the principles recognised as law in the *Philadelphia Baptist Association* v. *Hart*, 4 Wheaton, 1; *Inglis* v. *The Sailors' Snug Harbor*, 3 Peters, 148; *Milne* v. *Milne*, 17 L. R. 46; and *Succession of Franklin*, 7 An. 415.

In the case in 4th Wheaton, and that in 7th Annual, above quoted, it was held by the courts that "the devise was *in presenti* to persons who should be officers at the death of the testator, and to their successors in the trust; the vesting of the devise was not to be postponed to a future time, until a corporation could be created. It was to take immediate effect." And the devise was held to be void in law.

In the case in 3d Peters and in 17 L. R., above quoted, the devise was *per verba de futuro* to corporations not then in existence, which was to take effect when the corporations should be created. And the bequests in these cases were held valid.

So in the case before the court, the proceeds of the residue of the estate are to be held in trust by the executor until the trustees he is to name are brought into existence to manage the fund, or until, in some other way, the Legislature provides for its administration.

*C. Roselius*, for the Fink Asylum:

I. The clause in the will, which has given rise to this controversy, constitutes the foundation of an asylum for the widows and orphans; it is one of those institutions denominated by civilians *pia causa* or *pia corpora*, of which the testator is the founder.

Merlin, in his *Répertoire de Jurisprudence*, verbo *Fondation*, vol. 12, p. 279, says:

"Ce mot se dit des donations ou legs qui ont pour objet l'établissement, soit d'une église, soit d'un hôpital, soit d'une communauté, soit d'un séminaire, etc., ou qui sont faits sous la charge de quelque œuvre pie, à des églises ou des communautés déjà établies."

It was contended that this authority is inapplicable, because the author speaks of the former jurisprudence of France; but this is a mistake, for he says, at p. 280:

"Quant aux fondations d'hospices et d'autres établissemens d'utilité publique, elles ne peuvent pareillement avoir lieu qu'avec l'autorisation du gouvernement. V. l'art. 910 du Code Civil."

Again the same author says, vol. 15, p. 366, *verbo Institution d'héritier*, sec. 5, p. 1:

"Aujourd'hui, les gens de main-morte ne peuvent recueillir l'effet d'aucune disposition, soit testamentaire, soit entre-vifs, s'ils n'y sont autorisés par le gouvernement. (V. l'art. donations, sec. 3, p. 2, No. 1.)

"Mais il est à remarquer, qu'une fois l'autorisation accordée par le gouvernement, les tribunaux ne peuvent plus, comme je l'établirai aux mots: *Réduction de legs*, réduire les institutions ni les legs au profit des parens pauvres des testateurs, que le gouvernement a seul ce pouvoir, et qu'il en use quelquefois, et que d'ailleurs il peut accorder, comme de fait il accorde assez fréquemment, son autorisation à des institutions ou legs qui ont pour objet de former de nouveaux établissemens d'utilité publique."

Ricard, vol. 1, p. 137, says:

"Ce dernier arrêt et celui du 11 mai 1654, sont encore considérables pour une autre décision, en ce qu'ils ont jugé que lorsque les donations et les legs sont faits pour l'établissement d'un monastère, on ne pouvait pas opposer le défaut d'autorisation et de lettres patentes; ce qui est juste, parce que ces sortes de dispositions sont présumées faites sous condition, et pour avoir lieu, en cas qu'il plaise au Roi d'agréer l'établissement; et en effet, il serait impossible autrement d'ériger de nouveaux monastères, parce que l'on ne souffre pas qu'il s'en fasse, s'ils ne sont précédés d'une fondation, et il s'observe même que le contrat ou l'acte de fondation s'attache sous le contre-scel des lettres patentes pour en faciliter l'obtention."

Furgole, vol. 1, p. 391, is equally explicit:

"Les dispositions testamentaires sont valables, non-seulement lorsqu'elles sont faites en faveur des hôpitaux fondés et établis, mais encore lorsqu'elles sont faites pour en construire et fonder de nouveaux, auquel cas, la volonté du testateur doit être exécutée dans l'an."

The modern jurisprudence of France by no means conflicts with these principles. Troplong, who is undoubtedly the first living jurist, expounds the doctrine, with his usual vigor and lucidity, in his commentary on the 906th article of the Napoleon Code. V. *Donations et Testaments*, vol. 2, p. 196, No. 610 *et seq.*

It was asserted in the oral argument, by one of the learned counsel for the plaintiffs, that the Court of Cassation held a different doctrine, and this assertion seemed to rest on the following observations of the author, *loco citato*, p. 201:

"Quant à l'autre question, que la cour a entendu laisser intacte parce qu'il n'était pas nécessaire de la décider, celle de savoir si l'autorisation postérieure à l'ouverture de la succession était suffisante pour valider le legs, il n'est pas douteux, d'après les principes que nous avons établis plus haut, que l'arrêt de la Cour de Douai n'aurait pu d'avantage se soutenir."

How it can be concluded from this language that the opinion of the Court of Cassation is opposed to that of its first President, it is difficult to understand.

It was also said that Toullier laid down a different doctrine on this subject. On referring to that author, vol. 5, p. 86, the court will find, that so far from conflicting, there is a perfect concurrence between his views and those of Troplong.

The foundation of that doctrine is found in the Roman Law. In the 28th book, t. 5, §62 of the Dig., we read:

"In tempus capiendæ hereditatis institui heredem posse, benevolentiæ est; veluti, Lucius Titius, cum capere potuerit, heres esto. Idem et in legato."

Mackeldey, in his compendium of the modern Civil Law, vol. 1, p. ——, sec. 145, says:

"The term *pia causa* denotes an institution for pious and charitable purposes, or for the public benefit, and is the general name given to every establishment which has for its object the promotion of piety, the relief of necessitous persons, the spread of education and knowledge, or the advancement of science and the arts. Institutions of this kind are to be regarded as moral per- sons, only in case they have been recognized as such by the State, by way of approval and confirmation. Otherwise they lack the capacity for rights, and cannot acquire anything. Still the confirmation of them on the part of the State may be subsequent to their foundation; and then it has a retrospective effect back to the time of such foundation. If such *pia causa* be confirmed by the State, and therewith recognized as a moral person, it can not only have rights of all kinds, and make acquisitions *inter vivos* as well as *mortis causa*, but it likewise enjoys many privileges."

In a note to this number, the author says:

"If, therefore, a *pia causa* is founded and instituted by a testament, it is considered as having the capacity to inherit, although the confirmation by the State is only given after the death of the testator." Mackeldey, p. 178-9; 13th edition by Dr. Johnson Adam Fritz. Vienna, 1851.

The whole subject is carefully examined and developed in the 40th vol. of Glück's Commentary on the Pandects, sec. 1438, C. *De heredibus Instituendis*, from p. 1 to 108. At the conclusion of this masterly exposition of the legal principles applicable to the matter, he refers to a case precisely similar to that now before the court. It is the foundation of an orphan asylum for Catholic children by a *Mr. Blum* in Hildesheim. All the arguments used by the author in support of the validity of *Blum's* foundation are equally applicable to the foundation of the Fink Asylum for Protestant widows and orphans. See p. 105 *et seq.*

By reference to the *concordance entre le Code Napoléon et les Codes Civils Etrangers*, vol. 1, p. 81, the court will perceive that the Article 345 of the *Droit Commun Allemand* is substantially the same as Article 910 of the Napoleon Code.

Savigny, in his system of the modern Roman Law, likewise examines the subject and recognizes the same doctrine as that laid down by Mackeldey and the other authors already cited. 2 Savigny, p. 274, sec. 85.

From all these authorities, it is clear that the testamentary disposition of *Fink* founding the asylum, is perfectly valid, according to the principles of the Civil Law. The only inquiry, therefore, which can possibly arise is, whether our law is different in this respect?

So far from this being so, the Supreme Court has decided in the most express terms, that the law of Louisiana is in perfect harmony with the principles of the Civil Law as understood and applied in other countries.

In the case of *Milne's Heirs* v. *Milne's Executors*, 17 L. R., 52 *et seq.*, the question was examined with much care. The court laid down the following propositions:

"It is necessary, to enable a legatee to take under our laws, that he be in *existence* at the time of opening the estate, and have capacity to *receive* if the legacy is absolute; but if it is conditional, it is sufficient if the capacity to receive exists at the time of the fulfilment of the condition.

"Where legacies were given by the late *Julien Poydras*, of the parishes of Pointe Coupée and West Baton Rouge, for particular specified objects, the legacies were absolute, but there was no capacity in the legatees to take at the moment of opening the succession, and laws were passed authorizing the Police Juries of those parishes to accept the legacies for the objects named.

"So where legacies were left to two asylums for destitute orphan boys and destitute orphan girls, with directions to the executors to cause the same to be duly incorporated. Held, that these dispositions were conditional, and as soon as the condition was fulfilled by incorporating those asylums, the capacity to take the legacies was then created.

"The direction of the testator to his executors to establish the asylums mentioned in the will, and hand over the legacies to them when incorporated, is not in violation of the provision of the Code which declares that substitutions and *fidei commissa* are abolished.

"The object of abolishing substitutions, &c., was to prevent property from being tied up in the hands of individuals, and placed out of commerce, but it was never contemplated to abolish naked trusts which were to be executed immediately."

The second case in which the question arose and was considered by the Supreme Court, then composed of different Judges, was that of the *Succession of Franklin, Adelicia Acklen and "her minor child Emma* v. *J. W. Franklin, et al., trustees, &c.*, 7 A. R., 395 *et seq.* In this there was a difference of opinion among the Judges on other points; but the court was unanimous as to the question now under consideration. Mr. Justice Rost, in delivering the opinion of the majority of the court, says:

"The case of *Milne's Heirs* v. *Milne's Executors*, already quoted, was one of a bequest *per verba de futuro* to corporations not then in existence, which was to take effect when the corporations should be created. And in the case of *Inglis* v. *The Trustees of the Sailors' Snug Harbor*, 3 Peter's, 145, the majority of the Supreme Court of the United States interpreted the devise as being one of the same class; neither of these cases conflicts with the decision in the case of the *Baptist Association*, which is, on all hands, admitted to be law. I concede that the weight of authority, under our system of jurisprudence, as well as at Common Law, is in favor of the validity of dispositions *per verba de futuro*, to corporations not *in esse*, to take effect when they are created. But the bequest in this case is of a different kind; in the words of Judge Story, 'it is a devise *in presenti* to persons who should be officers at the death of the testator, and to their successors in the trust; the vesting of the devise was not to be postponed to a future time, until a corporation would be created. It was to take immediate effect, as in the case of the Baptist Association. See the case of the Sailors' Snug Harbor."

Not a single word is to be found in the separate opinions of the Chief Justice, or Justice Slidell, in the least conflicting with the views expressed by Justice Rost.

In the dissenting opinion of Justice Preston, the whole doctrine is thoroughly re-examined, and the conclusion arrived at is in harmony with the doctrine first recognized in the case of *Milne's Heirs* v. *Milne's Executors.*

These two cases, it is respectfully submitted, settle the jurisprudence of Louisiana on this subject.

When we direct our inquiry as to what is the jurisprudence on this point of the Supreme Court of the United States, we find that the same doctrine is held by that tribunal.

The case of the *Philadelphia Baptist Association et al* v. *Hart's Executors*, 4 Wheaton's Rep. p. 1 *et seq.*, was a bequest *in presenti*, in the following words: "Item. What shall remain of my military certificates at the time of my decease, both principal and interest, I give and bequeath to the Baptist Association that for ordinary meets at Philadelphia annually, which I allow to be a perpetual fund for the education of youths of the Baptist denomination, who shall appear promising for the ministry, always giving a preference to the descendants of my father's family." In that case, the court said:

"At the death of the testator, then, there were no persons in existence who were capable of taking this bequest. Does the subsequent incorporation of the association give it this capacity?

"The rules of law compel the court to answer this question in the negative. The bequest was intended for a society which was not at the time, and might never be, capable of taking it. According to law, it is gone forever. The legacy is void; and the property vests, if not otherwise disposed of by the will, in the next of kin. A body corporate afterwards created, had it even fitted the description of the will, cannot divest this interest, and claim it for their corporation."

The next case in which the question was presented was that of *Inglis* v. *The Trustees of the Sailors' Snug Harbor*, 3 Peter's Rep. 112 *et seq.*

Mr. Justice Thompson delivered the opinion of the court. He says:

"This case comes up from the Circuit Court for the Southern District of New York, upon several points, on a division of opinion certified by that court. In

FINK
v.
FINK.

the examination of these points, I shall pursue the order in which they have been discussed at the bar.

"I. Whether the devise in the will of *Robert Richard Randall*, of the lands in question, is a valid devise, so as to divest the heir at law of his legal estate, or to affect the lands in his hands with a trust.

"This question arises upon the residuary clause in the will, in which the testator declares: 'that as to and concerning all the rest, residue, and remainder of my estate, both real and personal, I give, devise, and bequeath the same unto the Chancellor of the State of New York, the Mayor and Recorder of the city of New York, &c., (naming several other persons by their official description only,) to have and to hold all and singular the said rest, residue and remainder of my said real and personal estate, unto them and their respective successors in office, forever, to, for and upon, the uses, trusts, intents and purposes, and subject to the directions and appointments hereinafter mentioned and declared, concerning the same, that is to say : out of the rents, issues and profits of the said rest, residue and remainder of my said real and personal estate, to erect and build upon some eligible part of the land upon which I now reside, an asylum, or marine hospital, to be called 'the Sailors' Snug Harbor,' for the purpose of supporting aged, decrepid and worn out sailors, etc.' And after giving directions as to the management of the fund by his trustees, and declaring that it is his intention, that the institution erected by his will should be perpetual, and that the above mentioned officers for the time being, and their successors, should forever continue to be the governors thereof, and have the superintendence of the same, he then adds, 'and it is my will and desire, that if it cannot legally be done, according to my above intention, by them, without an Act of the Legislature, it is my will and desire, that they will, as soon as possible, apply for an Act of the Legislature to incorporate them for the purposes above specified. And I do hereby declare it to be my will and intention, that the said rest, residue and remainder of my said real and personal estate should be at all events applied for the uses and purposes above set forth ; and that it is my desire all courts of law and equity will so construe this my will as to have the said estate appropriated to the above uses, and that the same should in no case, for want of legal form or otherwise, be so construed as that my relations, or any other persons, should heir, possess or enjoy my property, except in the manner and for the uses herein above specified.'

"The Legislature of the State of New York, within a few years after the death of the testator, on the application of trustees, who are also named as executors in the will, passed a law, constituting the persons holding the offices designated in the will, and their successors in office, a body corporate, by the name and style of 'the Trustees of the Sailors' Snug Harbor in the City of New York,' and declaring that they and their successors, by the name and style aforesaid, shall be capable in law of holding and disposing of the said real and personal estate, devised and bequeathed as aforesaid, according to the intentions of the aforesaid will. And that the same is hereby declared to be *vested* in them and their successors in office for the purposes therein expressed.

"If, after such a plain and unequivocal declaration of the testator with respect to the disposition of his property, so cautiously guarding against, and providing for every supposed difficulty that might arise, any technical objection shall now be interposed to defeat his purpose, it will form an exception to what we find so universally laid down in all our books, as a cardinal rule in the construction of wills, that the intention of the testator is to be sought after and carried into effect. But no such difficulty in my judgment is here presented. If the intention of the testator cannot be carried into effect, precisely in the mode at first contemplated by him, consistently with the rules of law, he has provided an alternative, which, with the aid of the Act of the Legislature, must remove all difficulty.

"The case of the *Baptist Association* v. *Hart's Executors*, 4 Wheat. 27, is supposed to have a strong bearing upon the present. This is however distinguishable in many important particulars from that. The bequest there was, ' to the Baptist Association that for ordinary meets at Philadelphia.' This association not being incorporated, was considered incapable of taking the trust as a society. It was a *devise in presenti*, to take effect immediately on the death of the testator, and the individuals composing it were numerous and uncertain, and there was no executory bequest over to the association if it should become incorporated. The court, therefore, considered the bequest gone for

uncertainty as to the devisees, and the property vested in the next of kin, or was disposed of by some other provision in the will. If the testator in that case had bequeathed the property to the Baptist Association on its becoming thereafter and within a reasonable time incorporated, could there be a doubt but that the subsequent incorporation would have conferred on the association the capacity of taking and managing the fund.

"In the case now before the court, there is no uncertainty with respect to the individuals who were to execute the trust. The designation of the Trustees by their official character, is equivalent to naming them by their proper names. Each office referred to was filled by a single individual, and the naming of them by their official distinction was a mere *designatio personæ*. They are appointed executors by the same description, and no objection could lie to their qualifying and acting as such. The trust was not to be executed by them in their official characters, but in their private and individual capacities. But admitting that if the devise in the present case had been to the officers named in the will and their successors, to execute the trust, and no other contingent provision made, it would fall within the case of the *Baptist Association* v. *Hart's Executors*.

"The subsequent provisions in the will must remove all difficulty on this ground. If the first mode pointed out by the testator for carrying into execution his will and intention, with respect to this fund, cannot legally take effect, it must be rejected, and the will stands as if it had never been inserted; and the devise would then be to a corporation, to be created by the Legislature, composed of the several officers designated in the will as trustees, to take the estate and execute the trust.

"And what objection can there be to this as a valid executory devise, which is such a disposition of lands, that thereby no estate vests at the death of the devisor, but only on some future contingency? By an executory devise, a freehold may be made to commence in future, and needs no particular estates to support it. The future estate is to arise upon some specified contingency, and the fee simple is left to descend to the heir at law until such contingency happens. A common case put in the books to illustrate the rule is: if one devises land to a *feme sole* and her heirs upon her marriage. This would be a freehold commencing in *futuro*, without any particular estate to support it, and would be void in a deed, though good by executory devise. 2 Black. Com. 175. This contingency must happen within a reasonable time, and the utmost length of time the laws allows for this is, that of a life or lives in being and twenty-one years afterwards. The devise in this case does not purport to be a a present devise to a corporation not in being, but a devise to take effect in *futuro* upon the corporation being created. The contingency was not too remote. The incorporation was to be procured, according to the directions in the will, as soon as possible, on its being ascertained that the trust could not legally be carried into effect in the mode first designated by the testator. It is a devise to take effect upon condition that the Legislature should pass a law incorporating the trustees named in the will. Every executory devise is upon some condition or contingency, and takes effect only upon the happening of such contingency or the performance of such condition. As in the case put of a devise to a *feme sole* upon her marriage. The devise depends on the condition of her afterwards marrying.

"The doctrine sanctioned by the court in *Porter's* case, 1 Coke's Rep. 24, admits the validity of a devise to a future incorporation. In answer to the argument that the devise of a charitable use was void under the statute 23, Hen. 8, it was said, that admitting this, yet the condition was not void in that case. For the testator devised that his wife shall have his lands and tenements, upon condition that she, by the advice of learned counsel, in convenient time after his death, shall assure all his lands and tenements for the maintenance and continuance of the said free school, and alms men and alms women forever. So that although the said uses were prohibited by the statute, yet the testator hath devised, that counsel learned should advise, how the said lands and tenements, should be assured, for the uses aforesaid, and that may be advised lawfully, viz: to make a corporation of them by the king's letters patent, and afterwards, by license, to assure the lands and tenements to them. So if a man devise that his executors shall, by the advice of learned counsel, convey his lands to any corporation, spiritual or temporal, this is not against any act of Parliament, because it may lawfully be done by license, &c., and so doubtless

40

FINK
*v.*
FINK.

was the intent of the testator, for he would have the lands assured for the maintenance of the free school and poor for ever, which cannot be done without incorporation and license as aforesaid; so the condition is not against law: *quod fuit concessum per curiam.*

"The devise in that case could not take effect without the incorporation. This was the condition upon which its validity depended, and the incorporation was to be procured after the death of the testator. The devise then, as also in the case now before the court, does not purpose to be a present devise, but to take effect upon some future event. And this distinguishes the present case from that of the *Baptist Association* v. *Hart's Executors* in another important circumstance. There it was a present devise, here it is a future devise. A devise to the first son of *A.*, he having no son at that time, is void, because it is by way of a present devise, and the devisee is not *in esse.* But a devise to the first son of *A.* when he shall have one is good, for that is only a future devise, and valid as an executory devise. 1 Salk. 226, 229.

"The cases in the books are very strong to show, that for the purpose of carrying into effect the intention of the testator, any mode pointed out by him will be sanctioned, if consistent with the rules of law, although some may fail. In *Thelluson* v. *Woodford,* 4 Ves. Jun. 325, Buller, Justice, sitting with the Lord Chancellor, refers to and adopts with approbation the rule laid down by Lord Talbot in *Hopkins* v. *Hopkins,* that in such cases, (on wills,) the method of the courts is not to set aside the intent, because it cannot take effect so fully as the testator desired, but to let it work as far as it can. Most executory devises, he says, are without any freehold to support them; the number of contingencies is not material, if they are to happen within the limits allowed by law. That it was never held that executory devises are to be governed by the rules of law, as to common law conveyances. The only question is, whether the contingencies are to happen within a reasonable time or not. The master of the rolls in that case says, (p. 329,) he knows of only one general rule of construction, equally for courts of equity and courts of law, applicable to wills. The intention of the testator is to be sought for and the will carried into effect, provided it can be done consistent with the rules of law. And he adds another rule, which has become an established rule of construction, that if the court can see a general intention, consistent with the rules of law, but the testator has attempted to carry it into effect in a way that is not permitted, the court is to give effect to the general intention, though the particular mode shall fail. 1 Peere Wms. 332; 2 Brown's Ch. 51.

"The language of Lord Mansfield, in the case of *Chapman* v. *Brown,* 3 Burr. 1634, is very strong to show how far courts will go to carry into effect the intention of the testator. To attain the intent, he says, words of limitation shall operate as words of purchase; implications shall supply verbal omissions. The letter shall give way, every inaccuracy of grammar, every impropriety of terms, shall be corrected by the general meaning, if that be clear and manifest.

"In *Bartlett* v. *King,* 12 Mass. Rep. 543, the Supreme Judicial Court of Massachusetts adopts the rule laid down in *Thelluson* v. *Woodward,* that the court is bound to carry the will into effect if they can see a general intention consistent with the rules of law, even if the particular mode or manner pointed out by the testator is illegal. And the court refers with approbation to what is laid down by Powell in his Treatise on Devises, 421, that a devise is never construed absolutely void for uncertainty, but from necessity, if it be possible to reduce it to certainty it is good. So also in *Finlay* v. *Riddle,* 3 Binn. Rep. 162, in the Supreme Court of Pennsylvania, the rule is recognized, that the general intent must be carried into effect, even if it is at the expense of the particular intent.

"A rule so reasonable and just in itself, and in such perfect harmony with the whole doctrine of the law in relation to the construction of wills, cannot but receive the approbation and sanction of all courts of justice; and a stronger case for the application of the rule can scarcely be imagined than the one now before the court. The general intent of the testator, that this fund should be applied to the maintenance and support of aged, decrepid and worn-out sailors, cannot be mistaken. And he seems to have anticipated that some difficulty might arise about its being legally done in the manner pointed out by him, and to guard against a failure of his purpose on that account, he directs application to be made to the Legislature for an incorporation, to take and execute the trust according to his will; declaring his will and intention to be, that his

estate should at all events be applied to the uses and purposes aforesaid, and desiring all courts of law and equity so to construe his will as to have his estate applied to such uses. And to make it still more secure, if possible, he finally directs that his will should in no case, for want of legal form or otherwise, be so construed as that his relations, or any other persons, should heir, possess or enjoy his property, except in the manner and for the uses specified in his will.

"The will looks, therefore, to three alternatives:

"1. That the officers named in the will as trustees should take the estate and execute the trust.

"2. If that could not legally be done, then he directs his trustees to procure an act of incorporation, and vests the estate in it for the purpose of executing the trust.

"If both these should fail, his heirs, or whosoever should possess and enjoy the property, are charged with the trust.

"That this trust is fastened upon the land cannot admit of a doubt. Wherever a person by will gives property and points out the object, the property, and the way it shall go, a trust is created, unless he shows clearly that his desire expressed is to be controlled by the trustee, and that he shall have an option to defeat it. 2 Ves. Jun. 335.

"It has been urged by the defendant's counsel that these lands cannot be charged with the trust in the hands of the heir, because the will directs that they shall not be possessed or enjoyed, except in the *manner* and for the *uses* specified. That the *manner* and the *use* must concur in order to charge the trust on the land. But I apprehend this is a mistaken application of the term *manner* as here used. It does not refer to the persons who were to execute the trust. But to the mode or manner in which it was to be carried into effect, viz: "by erecting upon some eligible part of the land an asylum or marine hospital, to be called the Sailors' Snug Harbor. And the *uses* were 'for the purpose of maintaining and supporting aged, decrepid and worn out sailors.' Whoever, therefore, takes the land takes it charged with these uses or trusts, which are to be executed in the manner above mentioned. And if so, there can be no objection to the act of incorporation, and the vesting the title therein declared. It does not interfere with any vested rights in the heir. He has no beneficial interest in the land. And the law only transfers the execution of the trust from him to the corporation, and thereby carrying into effect the clear and manifest intention of the testator. But being of opinion that the legal estate passed under the will, I have not deemed it necessary to pursue the question of trust, and have simply referred to it as being embraced in the point submitted to the court.

"If this is to be considered a devise to a corporation, it will not come within the prohibitions in the statute of wills. 1 Revised Laws, 364. For this Act of incorporation is, *pro tanto,* a repeal of that statute.

"Taking this devise, therefore, in either of the points of view in which it has been considered, the answer to the question put must be, that it is valid, so as to divest the heir of his legal estate, or at all events, to affect the lands in his hands with the trust declared in the will.

"If this view of the devise in the will of *Robert Richard Randall* be correct, it puts an end to the right and claim of the demandant, and might render it unnecessary to examine the other points which have been certified to this court, had the questions come up on a special verdict or bill of exceptions. But coming up on a certificate of a division of opinion, it has been the usual course of this court to express an opinion upon all points.

"It is not, however, deemed necessary to go into a very extended examination of the other questions, as the opinion of the court upon the one already considered, is conclusive against the right of recovery in this action."

See also the able opinion of Mr. Johnson, at page 135 et seq.

In the case of *Vidal et als* v. *Girard's Executors,* 2 Howard's Rep. 127 et seq., the case of the Baptist Association is expressly overruled. Mr. Justice Story says, at page 196:

"Whatever doubts, therefore, might properly be entertained upon the subject, when the case of the *Trustees of the Philadelphia Baptist Association* v. *Hart's Executors,* 4 Wheat., was before this court (1819) these doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded."

FINK
v.
FINK.

Here it seems to me to be clear, that whether the validity of the clause in *Fink's* will, founding the orphan asylum, be tested by the principles of the civil law or by those of the common law, the result is the same.

The institution of the universal or residuary legatee is made *per verba de futuro*. He says:

"It is my wish and desire, and I do hereby declare the same to be my will, that after the payment of my just debts and the several legacies hereinabove mentioned, that the proceeds of the whole of my estate, property, rights, effects and credits, be applied to the erection and maintenance and support of a suitable asylum in this city, to be used solely as an asylum for Protestant widows and orphans, to be called 'Fink's Asylum;' and I do hereby request and authorize my friend *Diederich Bullerdieck*, after my decease, to name and appoint three worthy and responsible persons as trustees to carry out my said intentions respecting the said asylum."

Here every sentence of the devise is *per verba de futuro*, nothing *in presenti*. The asylum is to be established with the proceeds of the residuum of the testator's successions in the city of New Orleans; he requests his executor to designate and appoint three worthy and responsible persons as trustees to carry out his intentions respecting the foundation of the asylum. How can these intentions be carried out, except by applying to the State for an Act of incorporation? It is obvious that the functions of the trustees were limited to taking the necessary steps to obtain the sanction or confirmation of the State and to organize the asylum. This is the whole extent of their trust. The legatee or recipient of the bequest is the charitable institution itself created or founded by the testator himself, subject to the condition that the State will sanction or confirm the asylum, by conferring on it the character and capacity of a juridical person.

II. The State of Louisiana has ratified and confirmed the foundation of the "Fink Asylum."

No objections are urged to the form and regularity of the Act of Incorporation.

A number of highly respectable gentlemen, among whom is the testamentary executor himself, being desirous of carrying out the benevolent intentions of the testator, and of organizing the "Fink's Asylum," prepare a charter which they ask the State to sanction; or in other words, they ask the State to invest the "Fink's Asylum" with the power and capacity of a juridical person. This application is granted; the corporation exists, and has intervened in this suit, asking the protection of the court against the attempt of distant collateral relations to defeat the charitable and noble dispositions which *Fink* has made of his property.

III. What are the objections urged against the validity of the bequest?

It is strenuously insisted that to be "capable of receiving by last will, it is necessary to be conceived at the time of the decease. C. C. 1469. To this objection we answer, in the first place, that it is obvious that the rule laid down in this Article applies to natural persons only, for they alone can be *born* alive; and in the second place we say, that inasmuch as a juridical person is a mere legal entity or abstraction, its conception must necessarily differ from that of a natural person; the conception of the former is mental, that of the latter physical; and in the third place, we submit that the argument, drawn from the provisions of this Article of the Code, is a *petitio principii*. It takes for granted that the asylum was neither conceived nor *in esse*, at the time of the testator's death; and we have shown conclusively, we think, that the confirmation or ratification by the State, of the foundation of the asylum, had a retroactive effect, so that in point of fact, the universal or residuary legatee was *in esse* when the testator died. The doctrine of the retroaction of the accomplishment of a suspensive condition is familiar to every lawyer. It is, therefore, difficult to perceive, in what respect, the Articles 872, 880, 1599 and 1602, or the case of the *Succession of Fisk*, 3 A. R. 705, conflict with the doctrine for which we contend in . support of the validity of this bequest. Nor can we see how a proper interpretation of Articles 934, 928, 947, 944, 948, 1469 and 1459 of the Code can possibly lead to a different conclusion.

As to the idea that the succession vested in the executor or trustees and thereby created an impossible title, we respectfully submit that there is not the slightest foundation for it. Nothing, whatever, is vested by this will either in the executor or the trustees to be elected by him. As before observed their

functions are limited to taking the necessary steps to carry the intentions of the testator with respect to the foundation of the asylum into effect; they are the mere temporary agents, for that purpose, and no other. A literal construction of *Isaac Franklin's* will, may perhaps justify the decision in the *Succession of Franklin*, of the majority of the court. But even in that case, it certainly admits of rational doubt, whether the court did not adopt, as their guide, the *letter which killeth, instead of carrying out the spirit and intentions which vivify.* I, for one, have always entertained the sincere conviction that *Mr. Justice Preston's* dissenting opinion was correct. But, be this as it may, where is the remotest analogy between that case and the one before the court, except with regard to the point decided in the Milne case?

It is said that "the whole Roman law is founded on an inference from the law *ejus servorum,* or the preceding law of that title, 362." That the latter law is the origin of the rule, there can be no doubt, but it does not appear to us that that can be considered as a reason for rejecting it; on the contrary, this proves beyond all doubt, to my mind, that *Mr. Justice Preston* was right when he said in the *Franklin* will case "this exception to the general rule, as thus enunciated by *Mackeldey,* is not, as has been contended, the mere creature of the statutory laws of Rome, but has its foundation in correct reasoning and the very nature of things. When the law maker lays down the general rule, relative to the acquisition of rights or property by natural persons, by means of a testamentary disposition, he requires the existence of the legatee or testamentary heirs at the time of the death of the testator; for, he who is not in being cannot acquire anything. But when a testator is desirous of becoming the founder of a charitable or educational institution, he does so on the implied condition, that the State will ratify and confirm his benevolent intentions. If the confirmation is withheld the will is defeated; but if granted, it operates like the accomplishment of all suspensive conditions, whether express or implied, and has a retroactive effect. The correctness of these views, I believe, is recognized in every system of jurisprudence, both ancient and modern, and I have heard nothing in the argument of this case, to induce me to entertain the slightest doubt of the soundness of the able opinion, rendered in the case of the Milne Asylums."

I am unable to understand, how it can be asserted that the Milne case is founded on a falacy. The learned counsel says, that "existence being necessary to constitute the capacity to take by testament, to remove this disability by a condition would be little short of an absurdity. That this cannot be done is shown conclusively by the concurrence of all jurists." I apprehend that the apparent absurdity results not from the application of the familiar and universally recognized rule we invoke, but from arguing in a circle. As regards the concurrence of all jurists, I flatter myself that I have shown conclusively that they are unanimous in their recognition and approval of the rule which my learned friends attempt to overturn.

What Marcadé says in his commentary on the 906th Article of the Napoleon Code, refers to the capacity of natural persons, and has no application to the questions we are discussing. Vol. 3, p. 397.

And his observations, so much relied on, when commenting on Article 910 of the Napoleon Code, evidently refer to the case where there has been no ratification or confirmation by the State.

It is needless to refer particularly to all the other authorities cited, such as Merlin, Coin-Delisle, Toullier, &c., because they are all considering the capacity of natural persons; and I have shown that when they speak of juridical persons, they admit the rule applied by the Supreme Court of Louisiana, in the case of *Milne's Heirs* v. *Milne's Executors,* and reaffirmed in that of the succession of Franklin. Take, for instance, Toullier, whose authority is invoked against us: he says, Vol. 5, No. 204, "Si les dons sont faits par testament l'autorisation du gouvernement pour les recevoir n'est pas moins nécessaire; mais, en attendant, les receveurs des pauvres et des hospices peuvent, sur la simple remise du testament, faire tous les actes conservatoires qui sont jugés nécessaires.

As regards the authority quoted from the 40th Glück's Commentaries, the court will find that the author throughout his careful, able and elaborate examination of the subject, fully sustains the views which I have endeavored to submit to the consideration of the court.

FINK
*v.*
FINK.

Lastly, it is contended, that the case of the *Congregational Church* v. *Henderson*, 4 R. R. 211, conflicts with that of the *Heirs of Milne* v. *Milne's Executor* An examination of the case will satisfy the court that there is no analogy, whatever, between it and that of Milne. So far from their being any conflict between them, the decision in the Milne case is expressly referred to and approved. *Judge Simon*, who delivered the opinion of the court, says: "It has been urged that the term, imposed by the testator for the payment of the legacy, is in the nature of a condition, that under the 1460th Article of the Civil Code, when the donation depends on the fulfillment of a condition, it is sufficient, if the donee is capable of receiving, at the moment the condition is accomplished;" and we have been referred to the case of the *Succession of Alex. Milne*, 17 L. R. 46, as containing principles applicable to the question at issue. In this case, it is true, that the testament was opened on the 14th of March, 1832, that the incapacity was removed on the 5th of March, 1841, and that, therefore, five years had not elapsed between the period of the opening of the will and the removal of the incapacity. Thus, it is insisted, that the legatee was capable of receiving at the time the first instalment was to be paid, and this is all that the law requires. But the term, in our opinion, cannot be assimilated to a condition. The payment of the legacy to be made at a certain period, was only delayed without its depending upon any uncertain event which was to happen or not, at the expiration of five years." The court then proceeds to point out the obvious distinction between a *condition* and a *term*, for the purpose of proving that the principles recognized in the case of the *Heirs of Milne* v. *Milne's Executors*, have no application to the case then under consideration. The real ground on which the decision, in that case, rests, is that the contract, under which the plaintiff claimed, had been entered into *in fraudem legis* and could, therefore, not give rise to any valid obligation.

It is, therefore, clear, I think, that the correctness of the doctrine laid down in the Milne case, was not only expressly recognized and re-affirmed by all the judges, in the case of the succession of Franklin; but that it was also sanctioned in that of the *First Congregational Church of New Orleans* v. *Henderson*.

Under this state of our jurisprudence, it is respectfully submitted, that the question can hardly be considered as an open one, and notwithstanding the powerful efforts made by our learned adversaries to demonstrate its fallacy, its soundness has not been impugned.

BUCHANAN, J.  *John David Fink*, of New Orleans, died, leaving a will which has been admitted to probate and execution. This will, dated the 7th November, 1855, contains the following clause:

"It is my wish and desire, and I do hereby declare the same to be my will, that after the payment of my just debts, and the several legacies herein above mentioned, that the proceeds of the whole of my estate, property, rights, effects and credits be applied to the erection and maintenance and support of a suitable asylum in this city, to be used solely as an asylum for Protestant widows and orphans, to be called "Fink's Asylum," and I do hereby request and authorize my friend *Diederich Bullerdieck*, after my decease, to name and appoint three worthy and responsible persons as trustees, to carry out my said intentions respecting the aforesaid asylum."

The plaintiffs, nearest of kin and heirs at law of the testator, pray that the above recited clause of the will be declared null and void, for the following reasons:

1st. Because there was no person in being capable of receiving said bequest at the time of the testator's decease.

2d. Because it creates a perpetuity, which no individual is authorized to do in a case like the present.

3d. Because of the uncertainty and vagueness of the bequest, and the omission of the testator to provide for the mode and manner in which his intentions, whatever they may have been, were to be carried into effect.

4th. Because such testamentary dispositions are in direct opposition to the policy of the law, and could not, in a case like the present, be carried into execution, without making, as far as this disposition is concerned, an entire new will for the testator.

5th. Because the said disposition does not in reality dispose of or transfer the property therein designated to any person or persons; and, as far as the said property is concerned, the testator must be considered to have died intestate.

In considering these objections we will be spared much labor by carefully examining who is the real devisee or legatee under this clause of *Fink's* will.

Note the expressions—"I will that the proceeds of my estate be applied, (after the payment of debts and of particular legacies,) to the erection and maintenance and support of an asylum in this city, to be used solely as an asylum for Protestant widows and orphans, to be called Fink's Asylum."

What is the object of the testator's bounty? Not the building to be erected; but the widows and orphans, for whom that building is to be a refuge and a home.

Again, what Protestant widows and orphans are intended? The answer is equally clear. Protestant widows and orphans *in this city;* that is to say, in the city of New Orleans, where the will was made: for it is in this city, says the will, that the asylum is to be erected for Protestant widows and orphans.

The difficulty in this case has arisen principally from *Mr. Fink's* having given a name to the asylum thus proposed to be built and maintained with the proceeds of his estate. But there are no words of devise to the asylum of that name. In this respect, the present case differs from that of *Alexander Milne's* will, reported in 17 La. Rep., 46, the doctrine of which case has been so much questioned by the counsel of plaintiffs. *Milne* declared in his will, his intention that an asylum for destitute orphan boys, and another asylum for destitute orphan girls, should be established at Milneburg, in the parish of Orleans, under the name, &c., and that his executors should cause the same to be incorporated—and *to the said contemplated institutions he gave and bequeathed,* &c., and *instituted for his universal heirs and legatees the said institutions,* &c.

We do not feel ourselves called upon to pronounce any opinion upon the correctness of the ruling of our predecessors in relation to *Milne's* will, containing dispositions so evidently distinguishable from those now under consideration. The only particular in which there is an apparent resemblance, is in the injunction of *Fink* to his executor to appoint trustees *to carry out his intentions respecting the aforesaid asylum.* But the language by no means implies, necessarily, what is expressed in terms unequivocal in the will of *Milne,* namely: that the executor or the trustees, or both together, should take measures for the incorporation of the "Fink's Asylum." On the contrary, it appears to us entirely probable that the design of *Fink* was that his executor should nominate trustees, in whom should vest the superintendence of the erection of the asylum, and the administration of the charity, without any other or further authority than what they would derive from the appointment of the executor under the will.

Had the testator gone so far as to name those trustees himself, and to vest his estate in them for the objects and purposes expressed, the will would have been void under Article 1507 of the Louisiana Code. The case of *Franklin's*

*Succession*, in 7th Annual Reports, would then have been directly in point. On the other hand, the design of the testator may have been that the trustees, so to be appointed by his executor, should merely advise and aid in all means sanctioned by law for the accomplishment of the testator's intention of founding an asylum for Protestant widows and orphans in the city of New Orleans. And were we compelled to give an interpretation of this clause of the will, in reference to the object of the proposed appointment of trustees, we would undoubtedly feel bound to understand this disposition in a sense in which it could have effect, if possible, rather than one in which it could have none. C. C. 1706. But no interpretation of this disposition is necessary. On its face, it is a delegation by the testator to a third person of the choice of administrators of a portion of the estate; and as such, by Article 1566 of the Code, is a mere nullity, and, under Article 1506, must be considered as not written.

Viewing, then, the Protestant widows and orphans in the city of New Orleans as the true residuary legatees of *John D. Fink*, we are dispensed from any remark upon the first ground of plaintiffs, to wit, that there was no person in being at the time of the testator's death, capable of receiving said bequest.

The second ground of objection is, that the will creates a perpetuity; which, say the plaintiffs, no individual is authorized to do in a case like the present.

It is not perceived by us that this will creates a perpetuity, in any other sense than every institution of heir by testament creates a perpetuity. The death of the testator invests the instituted heir with all rights to the same extent as they were possessed by the deceased. C. C. 934, 937. And this is alike the case, whether the instituted heir be a natural person or a mere legal entity, or a class of destitute or afflicted persons, objects of the testator's charity.

The third, fourth and fifth grounds of objection to *Fink's* will, may be considered together. They present, in different aspects, the uncertainty of the objects of the testator's benevolence, as objections to the validity of his will.

Article 1536 of the Code sanctions a donation *to the poor of a community*. And note that the word *community* in this Article means a municipal corporation. The word in the French text is *commune*, which has that signification. The Article is copied, word for word, from Article 937 of the Code Napoleon. Although Article 1536 is found under the head of donations *inter vivos*, its dispositions have been interpreted by this court in the case of the *Succession of Joseph Claude Mary*, 2 Rob. 438, to be applicable to donations *mortis causa*.

Among the legacies contained in the will of *Mary*, was one of five thousand dollars "to the Orphans of the First Municipality;" and the decision of the court was "that, under Article 1536 of the Civil Code, the city council of the First Municipality will be competent to claim and receive the legacy, and regulate its distribution among the intended objects of the testator's munificence to be found within the limits of the First Municipality." Surely the words "Protestant widows and orphans" used in *Fink's* will, in connection with other words which, as we have said, indicate with certainty his meaning to be "Protestant widows and orphans in the city of New Orleans," are words as definite and precise as the words used in *Mary's* will, "orphans of the First Municipality." This general form of expression is sanctioned by the law quoted.

Neither does it appear to us that the qualification "Protestant" of the nouns-substantive, "widows and orphans," is so vague, as to vitiate this bequest. It

.will be for the administrators of this charity to determine what widows and what orphans came under the denomination of "Protestant."

The cases of the *Philadelphia Baptist Association* v. *Hart*, in 4 Wheaton; of *Inglis* v. *Trustees of Sailors' Snug Harbor*, 3 Peters, and *Vidal* v. *Girard's Executors*, 2 Howard, have been much discussed in argument.

There is much curious learning in those cases on the subject of the jurisdiction the Courts of Chancery over charities and testamentary trusts, very little of which has any application in Louisiana. The point which those decisions of the Supreme Court of the United States were used to elucidate, the validity of a devise to a corporation, not *in esse* at the time of the opening of the succession of the testator, we have deemed unnecessary to consider herein, as we regard the devise in *Fink's* will as a devise to "the Protestant widows and orphans in New Orleans" and not to the "Fink's Asylum." To the same point, we have been referred to the law 62 of the title *de heredibus instituendis* of the Roman Digest (book 28, title 5) and the commentaries of two standard German authorities, Mackeldey and Mühlenbruch, upon that law; also to the writings of the French jurists Coin-Delisle, Troplong and others, commenting the 910th Article of the Code Napoleon, an Article which is not copied in our Code.

Did our subject require it, we would be pleased to review the doctrines of these authorities, all of the first rank in three different systems of jurisprudence. We have perused them with care, and with much edification, and may remark *en passant* that the doctrine of the Supreme Court of the United States, in the cases of the Philadelphia Baptist Association and of the Sailors' Snug Harbor, seems very like that of the Supreme Court of Louisiana in the cases of *Milne's* and of *Franklin's* wills. The distinction of bequests *per verba de presenti* and bequests *per verba de futuro*, so strongly drawn by both those courts, and which constituted the point of difference between the cases of the Baptist Association and the Sailors' Snug Harbor, decided by the one, and those of *Milne* and of *Franklin*, decided by the other, was no less decisive of the interpretation of the wills of *Staedel* and of *Blum*, as reported by Mühlenbruch, cases which, says that learned commentator, attracted the attention of all Germany. Glück's Illustration of the Pandects, continued by Mühlenbruch, vol. 40, pages 89 to 108.

Yet this distinction seems entirely unknown to the French jurists, perhaps because our Article 1460, which recognizes it, is not found in the French Code. An approach was made to the recognition of this distinction, and of the rule of the Roman law, "*hæres esto, cum capere potuerit*," in a decision of the Court of Cassation in March, 1854, commented by Troplong, 2d Donations et Testamens, p. 198 et seq., but it seems very questionable whether that decision is regarded as law in France.

A corporation has been formed, by the title of the "Fink's Asylum," under the Act of 14th March, 1855, "for the organization of corporations for literary, scientific, religious and charitable purposes," and has intervened herein, claiming to be the devisee under the clause of the will in question; and as such, to be entitled to take the residue of the estate, after the payment of the debts and particular legacies. The remarks already made by us are decisive of the intervention. The charity created by this will, in our opinion, is legally to be administered only by the city corporation of New Orleans.

It is, therefore, adjudged and decreed, that the judgment of the District Court, so far as regards the plaintiffs, be reversed; that there be judgment

FINK
v.
FINK.

against plaintiffs, declaring the will of *John David Fink* to be legal and valid; that, as to the intervenor, the Fink's Asylum, the judgment be affirmed dismissing said intervention; that the costs of the lower court be borne by plaintiffs, except those of the intervention, which are to be paid by the intervenor; and that the costs of appeal be paid jointly by the plaintiffs and the intervenor.

SPOFFORD, J., dissenting.   Conceding that the doctrine of the case of the *Succession of Mary*, 4 Rob. 438, is correct, that case does not appear to me to sustain the application of the doctrine made in this.

There, the bequest was of a specific sum of money directly "to the orphans of the First Municipality."   The only question was, who did the testator intend should administer the charity.   He having preserved a complete silence in this respect, the court properly determined that the Council of the First Municipality should control the distribution of the fund rather than the "New Orleans Catholic Association for the relief of Male Orphans," a corporation which the testator did not appear to have had in mind, and which must necessarily have restricted his bounty, which was intended to be disbursed without reference to religion or sex.

I do not understand that in the case alluded to there was any controversy as to the validity of the bequest; the question was, who should administer it.

Here, there was not a bequest by *Fink* "to the Protestant widows and orphans of New Orleans."   It seems to me a forced construction to say that because the erection of a building in New Orleans was contemplated, therefore the testator intended to confine his bounty to widows and orphans of New Orleans alone.   Yet it is only upon this hypothesis, if at all, that the city would be authorized to accept it in their name, under Article 1536 of the Code.

But the testator has emphatically shown that he did not intend the city authorities to have anything to do with the administration of this charity.   He has defined, or attempted to define, quite another power to control this matter. He has authorized a particular individual to name and appoint trustees to take and supervise the execution of a trust.   How can we disregard the expression of his will and substitute another will for it?

If the trustees cannot take, it seems to me that there is no one to take the donation, and it falls to the heirs at law.   The city of New Orleans makes no claim.

That the trustees cannot take seems to be conceded.   And I do not perceive that the *Milne* case, far as it goes, goes so far as to sustain the pretensions of the association, organized under the general law of corporations, and intervening in this cause.

I think the judgment should be affirmed.

*George Eustis, Robert Preaux* and *P. E. Bonford*, for a re-hearing:

Neither in the written nor in the oral discussions which have taken place, upon the universal disposition contained in *Fink's* will, was it suggested that the heir, instituted by that disposition, was *in esse* at the death of the testator.

If, then, we press with more than usual earnestness our demand for a reargument of this cause, our apology must be found in the fact that the decision of the court conveyed to us the first intimation that there existed in the disputed clause, the elements of a present devise to persons capable of taking when the succession was opened.

In the following views, which we have hurriedly thrown together, we shall endeavor to establish, that the disposition will not bear the interpretation placed upon it by the court; and that even if it did, it would be inoperative to

defeat the title of the legal heirs. In the limited time allowed for the preparation of applications like the present, a careful and well considered treatment of the subject is hardly practicable.

"The Protestant widows and orphans in the city of New Orleans" are, in judgment of the court, the residuary legatees of *John D. Fink.* We assume the court to intend that they take as a class, and not *ut singuli* or as individuals; and further, that the beneficiaries of this disposition are not such Protestant widows and orphans only as happen to be alive when the testator died, but every person in all future time who shall come within the description of the class designated. It is because such a class existed at the time *Fink* died that we understand the court to have rejected the first ground of the plaintiff's action, to wit: that there was no person or being at the time of the testator's death, capable of receiving the bequest.

The point of inquiry, then, is whether a class of persons, simply as a class, is a legal entity, capable of enjoying civil rights, and as such of being instituted testamentary heirs.

Our law recognizes but two descriptions of persons, the natural or physical, and the legal or juridical.

The juridical person is the creature of the law, and except in the solitary instance of partnership associations, which form persons distinct from the persons composing them, no power exists in private individuals to call a juridical person into being. Thus, no number of individuals can, by aggregating themselves together, or by being placed under particular classifications, assume to themselves, or be endowed, save by the exercise of the sovereign power, with a capacity—a personality separate from that of the several members out of which the body is formed. Such associations or classes have no legal existence. They are not the subjects of civil rights; they cannot become the debtors of civil obligations; they cannot give or receive, sue or be sued.

No one would speak of the lawyers, the doctors or the mechanics of a city, or of the Catholics, Presbyterians or Jews, or of any other incorporated class of persons as legal entities, or as possessing any capacities distinct from those of the individuals composing the class. What is there in the class of persons designated in *Fink's* will as the "Protestant widows and orphans in New Orleans" to take them out of this catagory? As a class they do not constitute a juridical person; as individuals forming the class, they are, it is true, natural persons capable of receiving. But if the will referred to them as individuals, it would embrace only such of them as were in existence at the testator's death, a limitation clearly not intended by the testator; and even with regard to these, the disposition would be null, as in favor of uncertain persons. Besides, if the clause were so limited, there would remain an important interest in the legal heirs unaffected by the disposition, and which would become available on the demise of the last liver included in the class. The "Protestant widows and orphans in New Orleans," then, not being a juridical person, cannot, as a class, be the instituted heir of *Fink,* and the error of the court in so determining them to be is, with all due deference, the more apparent from the impossibility of carrying out to its legal consequences this idea of the capacity of the class in question. For, if the instituted heirs be capable of receiving, why is not the succession simply delivered over to them? Why are they placed in a state of quasi pupilage, and the city of New Orleans oppointed their guardian?

It is said the "Protestant widows and orphans," and not the asylum, are the legatees, because the former are the undoubted objects of the testator's bounty, and must, consequently, be presumed to have been intended as his legatees. But it by no means follows that the party to be ultimately benefited by the testamentary disposition is the actual legatee. In the species of legacies known as *modal,* in all cases of legacies with a destination, it constantly happens that the legatee named has no real interest in the bequest, but that the same enures to the advantage of some person or class who may be moreover incapable of taking directly. Indeed, if the expression can be properly used in the connection, the beneficiary of such dispositions may even be an inanimate object. Instances of this character occur more frequently under the French law, where *fidei commissa* are permitted, but they are not unfrequent under our own system. In *Fisk's* will, a house was bequeathed to the city for the purpose of establishing a library; in *McDonogh's,* a large property was devised, also to the city, for educational purposes. Sums are constantiy left to the Charity Hospital and other incorporated institutions, the benefit of which accrues to the

FINK
*v.*
FINK.

sick, the aged and the needy; of the like character are the cases put by the commentators, of legacies left to an academy to found a prize, or to provide for the support of a favorite cat or dog, or to erect a monument to a celebrated personage, &c. No one could say, in the instances cited, that the students who are provided with a library, or the uneducated to whom gratuitous instruction is proffered, or the literary man to whom the prize is awarded, or the domestic animal, or the monument, is the legatee, though clearly in each case the object and the exclusive object of the testator's bounty. There is no warrant, therefore, for saying that the "Protestant widows and orphans in New Orleans" are the legatees of *Fink*, simply because they, as a class, are to reap the benefit of the devise.

Savigny has elaborated the idea of the juridical person at much length and with great clearness. His observations with respect to pious foundations, similar to the one sought to be established by *Fink*, merit consideration, as showing how carefully, even under the influence of a system so favorable to institutions of this description, the distinction between the foundation and the person to be benefited, was preserved, and also the necessity of the intervention of the sovereign power is recognized, in order to endow these institutions with the requisite capacity. We quote from the French translation of his treatise on Roman Law, vol. 2, p 268: "Aussitôt qu'un établissement de ce genre a le caractère de personne juridique, il doit être traité comme un individu, et c'est ce qu'ont fait les empereurs chrétiens. Ainsi donc, un hôpital, etc., est propriétaire au même titre qu'une personne naturelle ou une corporation, et les auteurs se trompent quand ils attribuent ce genre de propriété à l'Etat, à une ville ou à une église."

In sec. 89, p. 274, he treats of the manner in which the juridical person is created. The appositeness of his views to the present case is so striking that, though the extract is longer than we would wish, we cannot refrain from quoting a portion of his observations: "Indépendamment de la raison politique, la nécessité du consentement de l'Etat, pour la formation d'une personne juridique, trouve sa source dans la nature même du droit. L'homme, par le seul fait de son apparition corporelle, proclame son titre à la capacité du Droit, principe auquel l'esclavage faisait chez les Romains une large exception, et dont l'application est bien autrement générale parmi nous. A ce signe visible, chaque homme, chaque juge, sait les droits qu'il doit reconnaître, les droits qu'il doit protéger. Quand la capacité actuelle de l'homme est étendue fictivement à un être idéal, ce signe visible manque, et la volonté de *l'autorité suprême peut seule* y suppléer en créant des sujets artificiels du Droit: abandonner cette faculté aux volontés individuelles, ce serait infailliblement jeter sur l'état du droit une grande incertitude, sans parler des abus que pourraient entraîner des volontés frauduleuses. A cette raison décisive, prise dans la nature même du Droit, se joignent des considérations politiques et d'économie politique. On reconnaît que des corporations peuvent offrir des dangers, mais l'extention illimitée des fondations n'est pas toujours désirable ou indifférente. Si l'on faisait une riche fondation pour la propagation de livres ou de doctrines dangereuses pour l'Etat, pour la morale ou la religion, l'Etat devrait-il souffrir? Les fondations même de pure bienfaisance ne doivent pas nonplus être entièrement abandonnées aux volontés individuelles. Si dans une ville, par exemple, où les établissements en faveur des pauvres seraient bien organisés et pourvus de revenus suffisants, un testateur riche par une charité mal entendue, instituait des aumônes qui viendraient déranger les bons résultats de la charité publique, l'Etat n'aurait aucun motif de donner à cette fondation plus de consistance, en lui conférant les droits de personne juridique. Ici, indépendamment du caractère de la fondation, il s'agit encore d'éviter une accumulation exagérée be biens en main-morte. Ce genre d'abus peut exister même pour les fondations autorisées par l'Etat; mais il n'y aurait aucun moyen d'y remédier, si les particuliers pouvaient toujours créer de nouvelles fondations." P. 278.

To us the intention of *Fink* to create one of these juridical persons appears so clear, that the difficulty which rests upon our minds is to imagine a form of disposition in which that intention could have been made more manifest than it is in the expressions he has used.

He directs that the residue of his property after the payment of his debts, and some particular legacies, shall be "applied"—to what?—"to the erection and maintenance and support of a suitable asylum, in this city, to be *used* solely as an asylum for Protestant widows and orphans." The widows and orphans

are not mentioned in the disposing part of the clause, but only in connection with the *destination* or use to which this foundation or asylum may be devoted, and that his main object should be made more distinctly to appear he invests the creature, the juridical person he sought to bring into being, with his name, and directs it shall be termed "Fink's Asylum." In addition to this, the executor is to appoint three trustees who are to carry out the intentions of the testator, respecting the aforesaid asylum. These trustees are, 1st, to build the asylum in a suitable manner; 2d, to adopt a mode of administration for its government; 3d, to name it according to the directions of the will, "Fink's Asylum," and then deliver it over to the administrators. It is after all this is done and completed, that the asylum is to be *used* as an asylum for Protestant widows and orphans; but it is the *asylum* which must be erected and styled; such is the positive and unequivocal will of the testator, expressed in a clear and unambiguous manner, and the only mandate of the trustees is, to carry out and realize these intentions.

It is true that Article 1706 C. C., provides that a disposition must be understood in the sense in which it can have effect, rather than that in which it can have none. But this Article furnishes the rule of interpretation for obscure or ambiguous dispositions, and has no application to the clauses of *Fisk's* will, the meaning of which appears to us to be free from reasonable doubt. The true principle to be applied in this case, is that enunciated in the preceding Article (1705), which requires that the intention of the testator should be sought in the proper signification of the terms of the testament. " *Quum in verbis nulla ambiguitas est, non debet admitti voluntatis quæstio.*"

But a branch of this case remains to be considered, the importance of which cannot well be over estimated.

The capacity of the city to administer and carry into effect this bequest, or, what is the same thing, to take and execute it, was not argued at bar, and the undersigned venture to submit their views, in relation to it, to the consideration of the court, now for the first time.

It can do no harm; it will afford an opportunity to the court to reëxamine the important doctrine which is the basis of their opinion, should they deem fit so to do, and the undersigned will have discharged their duties to their destitute clients.

The propositions which they, with great deference will submit to the court, with the confidence that if either be sustainable, an opportunity will be offered for a further investigation of the subject, are:

1st. That the city has no legal capacity to administer or take this bequest.

2d. That under its present organization, it has no means or power to carry it into effect.

3d. That the charge and responsibilities of this administration cannot be imposed on the tax payers, there being no law to authorize it.

The views taken must necessarily be cursory and imperfect, from the very short time allowed for their preparation, and for this, the indulgence of the court is asked.

In the third volume of the Annual Reports, the case of the *Louisiana State Bank* v. *Orleans Navigation Company et al.*, is reported. In that case, the powers of municipal corporations under our laws were discussed and examined in the arguments of the learned counsel and in the opinion of the court. The case turned on the powers vested in the corporation of New Orleans, and the court held that they must be tested by our own codes, legislation and jurisprudence, and that it was useless to look elsewhere for their limitation or extension; that by the Act of 1805 and various special delegations of authority, the idea of any other power being granted them, such as the police and the preservation of good order among the population require, is excluded by the very terms of the Legislature. The court accordingly decided that the corporation had no authority to loan its credit for the improvement of the navigation of the Bayou St John and of the commerce in that part of the city where the canal terminates. Loc. cit. p. 294 *et seq.*

It may, therefore, be assumed, that the city of New Orleans is a corporation of limited powers, having only those powers expressly granted, or which are necessary to carry into effect the civil government of the same.

Can this corporation receive or execute administrations, trusts or *fidei commissa* created by donations *inter vivos* or *mortis causa?*

It can, provided the trust is authorized by law and not otherwise. What trusts is a municipal corporation authorized by law to receive or take? Those trusts which have for their object some matter within the acknowledged powers of administration with which the municipal administration is invested, and none others.

The Article 1536 of the Code, does not purport to confer powers on municipal corporations; it merely provides for the mode in which donations to them may be accepted—that is those donations, the object of which being within the corporate powers, may be legally accepted and carried into effect. The objects mentioned, are those necessarily within the circle of municipal administration, the benefit of an hospital, *the poor of a community—les pauvres d'une commune* or establishments of *public* utility.

It is obvious that publicity, generality, so to speak, universality is the predominant idea inseparable from all these objects, to the exclusion of portions of a separate class and denomination.

Is there anything in our jurisprudence which countervails or extends this doctrine?

The court considers the city of New Orleans as having the capacity to administer this charity, and the opinion of the court requires that it be administered only by the city corporation of New Orleans.

What says the Code?

A corporation cannot be administrator, guardian, or testamentary executor, nor fulfil any other office of perpetual trust. Art. 432.

There are certain matters in which municipal corporations can be administrators and exercise offices of personal trust, and those are matters over which they have control, by virtue of their powers of government, conferred on them by the State. Legacies having objects within that circle have been sustained and confided necessarily to municipal administration. Thus, in the case of *Marie* cited by the court, the court authorized the corporation to take *and regulate the distribution* of a legacy among the objects of the testator's bounty, found within the limits of the municipality.

This legacy was sustained, as it seems, on account of its generality and exclusion of no class, under the Article 1536.

Note the manner and the grounds on which the doctrine laid down in the case of *Marie* is affirmed by the Supreme Court in the *McDonogh* case, 8 An. Rep. 248.

So the bequest of a sum of money to the orphans of the First Municipality of New Orleans, was recovered by the council of that Municipality. This was a donation *causa mortis, indefinite* and *comprehensive* in its terms, making no distinction among the beneficiaries either as to age, sex or *religion,* and was maintained as valid by the Supreme Court.

What was the reason for which the court in that case concurred in the decision of their predecessors? Is not the reason given? Is it not the universality in the operation of the bequest? No distinction as to religion. The object of the legacy being within the legitimate sphere of good government.

The opinion in the *McDonogh* case has in other parts a recognition of the same doctrine

The *Girard* legacy, which was sustained in part, had for its sole object the health and general prosperity of the inhabitants of New Orleans, and the proceeds of the property bequeathed were to be applied to those purposes. *Girard* v. *N. O.*, 2 An. 899.

There are sectarian charitable institutions in the State, but they all have their existence by special legislation, and it is believed that no sectarian charity has ever been engrafted on a municipal corporation, nor has it any place in Louisiana, except by a positive law to that effect. Could a trust for the education of a particular class of Protestant or Catholic youths be engrafted on the city government, by reason of the general educational powers? The question answers itself.

With these hasty remarks concerning our legislation and jurisprudence, the undersigned call the attention of the court to the administration of this bequest by the city.

Our first position being that the corporation of New Orleans has no capacity to take this bequest, in furtherence of this absence of capacity, no means have been provided by law for the administration or carrying into effect of it.

In providing for the poor, they are generally subdivided into classes. It would not be proper that they should be congregated in the same buildings. There are consequently separate establishments for the infirm, for orphans, widows, and perhaps for different sexes. There are several institutions under special laws of the state of this character.

The descendants of the ancient population of Louisiana, the French, Spanish and Italians, and their descendants, a large portion of the German, and more than half the Irish population, may be set down as Catholics, and consequently excluded from the benefit of this Christian bequest.

It is fair to assume that at least three-fifths of this aggregate population of New Orleans are Catholic. Out of every five widows needing this charity, and asking admittance to this asylum—*this institution of public utility*—three will have the door shut in their faces—and by whom? The government of their own city. Why? Because they are Catholics!

And who is to exercise this obnoxious, this odious power? The Executive of the city. Whether the power be exercised in the first instance by warden or policeman, the power and the responsibility rests with the Executive—the Mayor of the city.

The necessary consequences of this state of things in a purely popular government, without any conservative element, and constituted by frequent elections under the existing causes of the day, are obvious, and require no elucidation.

The introduction of a noxious element like this into a political municipal system, in its operation can be productive of nothing but difficulty, faction and disorder.

The legislation on the subject of the poor of New Orleans deals with that class as a general aggregation, without any limitation or exception. *Vionet's* case, 4 An. Rep., 43. Statutes of 14th March, 1816, and 17th Feb. 1821.

Under the last head, concerning the responsibility imposed on the city of New Orleans, by this administration, let us suppose a case. Let us suppose the case of a Treasurer putting the amount of this bequest in his breeches pocket, under the hope of a triumphant acquittal by a verdict of his peers; who is responsible for this defalcation, and bound to make it good? Who but the corporators of New Orleans, three-fifths of whose poor were excluded from the charity?

After the decision, first quoted, of the Navigation Company case, it would be quite out of place to refer as authority to any other jurisprudence than our own on this subject.

It is certain that many municipal corporations could be seized of property in trust for charitable purposes in several of the United States and in England. Angell & Ames on Corporations, No. 166. In England the necessity of keeping these trust funds separate from the municipal treasury, has been enforced by an Act of Parliament in the year 1836, by which the appointment of separate trustees is ordered, thus getting out of the difficulty into which the judgment of the court will necessarily involve the city. But in this act there is no attempt to shield the corporations for past misconduct in the management of trust funds. An account has been decreed to be taken in one case for two hundred years back. Grant on Corporations, 514.

It is assumed that the heirs of the testator or, perhaps, the beneficiaries, through the State or persons named in the will, would have a remedy against the city for a misapplication or negligent loss of the charitable funds. Angell & Ames on Corp. sects. 694, 695.

If this view of the subject be correct, the responsibility of this administration is a matter of serious import, and it is asked, with all respect, where is the law attaching it to the city government?

It may not be out of place to state that the control which the government in France has over all bequests of this kind, provides the means in all cases of preventing the consequences which, without a salutary supervision, must result from the indiscriminate receipt of donations of this kind.

The government alone can authorize the execution of testamentary dispositions of this kind.

This power was intended as a check upon the inconsiderate zeal or caprice of testators which would deprive their relations of their succession. The government is the judge of the motive of the testator; it can order the acceptance of the bequest, or refuse it, or what frequently happens, authorize its accep-

FINK
*v.*
FINK.

tance on the condition of its reduction to a limit fixed by itself. In establishing the limits, it takes into consideration the fortune left by the testator to his heirs independent of the bequest, the condition and the number of these heirs, the wants of the establishment in favor of which the bequest is made, and its conclusions are the result of the consideration of all these circumstances. Code Napoleon, 910; 8 Duranton, p. 81, sec. 260.

Has the court considered that the city is bound to take upon itself this administration, and cannot repudiate it? Or that a discretion may be exercised in this respect by the municipal government?

Either of these views strongly implies the necessity of some legal authority in order to sustain it, and both concur in 'sustaining the argument which we have the honor to submit in support of our propositions.

Moreover the property cannot be adjudicated to the city, it not being a party to this suit. See the case of *Musgrove et al.* v. *Church of St. Louis*, 10 An. p. 431, 432 and 433.

*G. & C. E. Schmidt*, on the same side:

The importance of the principles involved in this cause, and the interest of the heirs whom we represent, impose upon us the duty respectfully to request the reconsideration of the opinion already delivered adverse to the claims of our clients.

In fulfilling this professional obligation we trust we shall be pardoned, if we examine the doctrines of the court with that freedom and independence which our duties require, without, however, losing sight of the respect due to the members of the highest tribunal of the State, whose exalted station and acknowledged impartiality entitle their opinions, even when erroneous, to be treated with great deference.

We are persuaded that inasmuch as the doctrines upon which the opinion of the majority of the court is predicated were not presented, nor even suggested by the counsel of the executor, and could, consequently, not have been foreseen by us, that the court will be disposed attentively to examine such arguments as we may be able to adduce to show that the rules adopted in deciding the cause are not applicable to the present controversy.

The will of the late *John D. Fink* appropriates the residue of his estate, after the payment of his debts and certain legacies, " *to the erection and maintenance and support of a suitable asylum, in this city, to be used solely as an asylum for Protestant widows and orphans, to be called ' Finks Asylum.' " And the testator further adds, " and I do hereby request and authorize my friend, Diederich Bullerdieck, after my decease, to name and appoint three worthy and responsible persons as trustees, to carry out my said intentions respecting the aforesaid asylum.*"

The above disposition being the one in relation to which this controversy arose, its interpretation and construction were to be determined by the court, in case any doubt arose as to its meaning.

The intention of the testator, according to the admitted rules governing the construction of wills, was to be the guide of the court in determining the import of this testamentary disposition. This appears to be conceded; and we have no doubt it will also be admitted that this intention must be collected from the language used in the will itself, for such is the express provision of the Code, Art. 1705. See, also, *Theall* v. *Theall et als.*, 7 La. 230. But the intention of *Fink* appears to us so plain, that it is impossible for any person, be he learned or illiterate, to misunderstand it, since he evidently desired to create an *institution* in New Orleans devoted exclusively to the maintenance and support of Protestant widows and orphans.

We cheerfully admit that in order to arrive at a correct conclusion in relation to the construction of the will, it became necessary in the first place to ascertain *who is the real devisee*, or *legatee*, and we are not disposed to deny that " *the object of the testator's bounty*" was not the building to be erected, but the Protestant widows and orphans for whom this building was to serve as a refuge. But while admitting the truth of these two propositions, we think we can demonstrate that the inference deduced from them is entirely erroneous. The proposition of the court, if reduced to a syllogism, would read thus: " Every person who is the object of the bounty of a testator becomes thereby his devisee or legatee. The Protestant orphans and widows were, in this instance, the objects of his bounty. *Ergo*, they are his devisees or legatees."

The fallacy of this reasoning consists in the major term, which assumes as true, that *every one* who is the object of the bounty of a testator, thereby becomes a devisee or a legatee, which though *often true*, is not so *in this particular instance.*

In legal parlance *a devisee* is one to whom a testator bequeathes real estate, *a legatee*, one to whom he gives goods or chattels. Both devisees and legatees are recognized juridical persons, whose legal existence gives them rights which they can enforce in a court of justice. They may demand and enforce the delivery of the devise or legacy from the executor of the will, and if his functions have ceased, from the heirs. But inasmuch as it is evident that no Protestant widows nor orphans would have the right to compel either the executor, or any one else charged with the execution of this portion of *Fink's* will, to deliver to them any part of the residuary bequest or its revenues, *they are clearly neither devisees nor legatees.*

In proof of this position, we refer to the decision in this very cause, by which the court declare that the the City of New Orleans is the legatee; for it is evident that the city authorities alone, should the court adhere to its decision, will have the right to compel the exeutor to account and to deliver to them the residue of the estate of *Fink*, and that the widows and orphans must be contented to receive such portions of the revenues of the estate as the city may choose to give them in conformity with the regulations they may adopt for the administration of the charity. The city is consequently, by the decision in this cause, the real legatee or devisee, and it is a misnomer to apply such a term to the Protestant widows and orphans.

Having thus shown, as we think, conclusively, that the contemplated institution, to be called Fink's Asylum, a private eleemosynary establishment to be organized and managed by trustees to be selected by *Bullerdieck*, was in contemplation of law the sole legatee, and as such *charged by the will* to carry into effect the intentions of the testator, it follows, as a necessary consequence, that the reasoning which has led to a different conclusion is incorrect.

But if the construction we put upon the will, as above explained, be exact, it is admitted that the bequest is void; because *the institution* was not in existence at the time of the opening of the succession—and hence incapable of administering the charity. But if so, the legacy falls, and the property intended to be given to the asylum belongs rightfully to the heirs.

In the next place we respectfully insist that by no known rule of judicial construction, can the bequest of the late *John D. Fink* be considered as given to the city of New Orleans, to be by it administered for the benefit of Protestant widows and orphans.

The late Judge Martin, in deciding the case of *Theall* v. *Theall et als.*, already quoted, says that, "constructions and interpretations are not to be resorted to for the discovery of the testator's intention, when he has used none but plain, unequivocal expressions. Candles are not to be lighted when the sun shines brightly."

The doctrine thus forcibly expressed by this venerable jurist is not only in accordance with the express provisions of our Code, but in conformity to the rules of interpretation adopted in every system of jurisprudence. If, therefore, as we verily believe, the intention of the testator was so clearly expressed that it was impossible to misunderstand it, it left no room for interpretation. In this opinion we have been confirmed by the views taken by our learned adversaries, who considered the sole question involved in this cause as depending on the legal inquiry whether a corporation, created after the opening of the succession, was capable of administering the charity. It appears that even they, who had examined the law applicable to the case in all its various aspects, never for a moment supposed that the city of New Orleans, which had preferred no claim, and to whom the testator certainly never intended to confide the administration of his charity, could have any pretension to be the residuary legatee of the late *John D. Fink.*

The principles adopted by the court in deciding this cause have excited the surprise of all parties, and as the plaintiffs, until the present moment, have had no opportunity of examing them, they hope the court will be disposed carefully to consider the reasons which appear to militate against its decision.

We do not believe, for the reasons already assigned, that there was any occasion to resort either to interpretation or construction of the will. But if

FINK
v.
FINK.

there was, we are firmly convinced that the construction put upon it by the court cannot stand the test of a serious examination.

The construction of all written language must be either *grammatical* or *logical*. The former examines the meaning of the words employed and the sense in which they are used, as deducible from the grammatical construction of the sentences. The latter supplies, by the aid of right reasoning, the errors and omissions that may occur in the language for the purpose of rendering that clear and precise which appears to be confused or obscure. Grammatical construction construes words as used in their ordinary acceptation, and so does logical construction. But the latter, which views the whole tenor of the language in connection with the subject it is intended to explain, is, by the writers of legal hermeneutics, divided into declarative, extensive and restrictive constructions, (Eschbach, Introd. générale à l'étude du droit, Paris ed. pp. 9 and 10 ; Lieber's Legal and Political Hermeneutics, chs. 2 and 3.) Applying these rules to the construction of wills, which are always to be interpreted so as to give effect to the intention of the testator, the reasoning which enables us to ascertain such intention must be *declarative of the will ;* and the construction can neither be *extensive*, nor *restrictive*, without violating the intention. It appears to us that this rule has been departed from in the interpretation given by the court when it construes the declaration of the testator that the asylum is to be erected in New Orleans, as equivalent to a positive injunction to confine his liberality to the Protestant widows and · orphans *residing in New Orleans.* The testator ordained that a suitable asylum should be erected *in* the city of New Orleans ; that is, within the corporate limits of the city ; but it does not therefore follow that all widows and orphans residing beyond those limits should be deprived of his bounty. Such a construction considers the building as the principal object the testator had in view, and the recipient of his beneficence as dependent on the location of the building. Such interpretation is evidently *restrictive* and much too narrow and illiberal, and it is moreover in conflict with the acknowledged objects of charities of this description.

In order to test the accuracy of this interpretation, let us suppose that the testator had said that "Fink's Asylum" should be erected "*in a healthy location in or about New Orleans,*" would this imply that all widows and orphans, *not residing in such location*, must be excluded from the benefit of his bounty ? Yet by the rule of constuction adopted, such would have been the necessary consequence. But as that would have frustrated the testator's intentions, this rule of construction is inadmissible and must be discarded.

The legal definition of a charity is " *a gift to a general public use—which extends to the rich as well as the poor.*" (Grant on the law of Corporations, Phila. ed. p. 125, and the authorities there cited.) But it requires no argument to show that a charity, intended for a *general public use*, ought not to be limited to the exclusive use of a parish or a city.

In addition to these considerations, we have not the least doubt that it is not conformable to the intentions of the testator, who was a German Protestant, and who, no doubt, intended that the widows and orphan children of his countrymen, whether residing in New Orleans or in any other parish of the State, should be permitted to benefit by his liberality. The reasoning of the court on this subject appears to us to amount to this : " The testator ordered the asylum to be built in New Orleans, *ergo*, he intended it for the exclusive use of the Protestant widows and orphans residing in New Orleans ; and upon this hypothesis it raises another presumption, to wit: that it was intended for the *poor* Protestant widows and orphans of New Orleans, and then leaving out the qualification of the word *poor*, deduces the inference that it was intended for *the poor* of New Orleans, and that the city is hence entitled to administer the charity.

The premises upon which the whole of this reasoning is predicated are, as we have shown, radically erroneous, and none of the deductions from the premises, even if these were correct, as they are not, is logical,

'1st. Because it was not the intention of the testator to limit his beneficence to the widows and orphans residing in New Orleans ;

2d. Because charities of this kind, as we have also shown, are not necessarily intended for the exclusive benefit of the poor ; and

3d. Because the city cannot legally administer a charity of this kind.

We have already proved the first two of these propositions, and we shall examine the third more attentively hereafter ; but before doing so we must be-

331

stow a passing notice on an observation of the court, to this effect, that "there are no words of devise to the Asylum." This remark was no doubt intended as an argument to show that the charitable institution whose creation was ordained, was not in reality the legatee. But if so, we can hardly believe it would be seriously insisted on. The word *devise* in its legal acceptation, means a bequest of real estate, but is here probably used as comprehending a bequest of both real and personal property. In whichever sense it be employed, the assertion that the testator has used no word of devise is equally erroneous. The testator declares: "It is my *wish and desire*, and I do hereby declare the same to be *my will*, that after the payment," etc., "the proceeds," etc., "be applied to the erection," etc., "of a suitable Asylum," etc. Such a disposition would, at Common Law, where the rules of construction are incomparably more strict than with us, be a valid devise to the trustees of the Asylum, if in existence at the opening of the succession, both of real and personal estate. (*Reed* v. *Reed*, 9 Mass. 379; *Anderson* v. *Grebel*, 1 Ashm. 136.) *Fink* applies "the proceeds of the whole of his estate, property," &c., and both the terms *estate* and *property*, whether used separately or in connection, are, according to innumerable decisions, both in our sister States and in England, declared to constitute a valid devise. (See Bacon's Abridg. verbis Legacies and Devises, C. § 2, 3, etc.)

The words "give and bequeath" are, technically, words of devise; but they are not sacramental, especially in wills, where the intention of the testator is to be ascertained and carried into effect. If it were necessary to produce authorities on this subject, those already quoted amply sustain our position, and our own courts have uniformly acted on this principle.

We now resume our inquiry, *as to the legal capacity of the city of New Orleans to administer the fund destined for the support of Fink's Asylum*, which capacity we believe does not exist. If the city possess this capacity, whence does it derive it? The franchises of the city all depend on its charter, and this emanates from the Legislature. The city, no matter how solemnly its existence has been recognized, can exercise no power not delegated by the Legislature, except those which are inferentially granted for the purpose of carrying the delegated powers into effect. But as neither its charter, nor any other law that can be produced, authorizes it to act as trustee of a charitable institution like the one contemplated in the present case, we have the right to infer that the authority does not exist. It is, no doubt, true that if a bequest were made to the poor of the city of New Orleans, and no person were appointed to administer the trust, that the city would be charged with its administration; but this doctrine depends on principles radically different from those applicable to the present case. These principles were to a certain extent laid down and explained in the case of *The State of Louisiana* v. *McDonogh's Executors*, 8 An. p. 249, where it is said, that "legacies to pious uses were authorized by law for the purpose of procuring aid from individuals in supplying those wants which the State itself, or the communities into which it is divided, were bound to provide for, in the interest of society, and as a function of government." The court further declares that the support and education of the poor was one of the objects contemplated, but this necessarily applies to such poor as the city was bound to support, even without the aid of charitable donations. In such cases, if the bequest was made to the poor of the city, it had a beneficial interest in the donation, and consequently, on general principles, was entitled to the administration of the fund when the testator had omitted to appoint an administrator. The same principle is acted upon daily in the administration of estates in the Court of Probates, and is the one recognized and sanctioned in the case of the *Succession of Mary* (reported in 2 R., 438, and relied on by the court.) This principle is unquestionably correct, but it is radically different from that promulgated and acted on in the present case; for,

1st. The city of New Orleans is under no obligation to support Protestant widows and orphans, and hence, has no beneficial interest in the administration of property given for their support.

2d. Even if this bequest was, as the court supposes, limited to the Protestant widows and orphans of New Orleans, a supposition which we deem erroneous, yet as the Protestant religion, if any such exist, is neither that of the State of Louisiana, nor of the city of New Orleans, but limited to a sect, or sects, which have no recognized legal existence, it would be impossible for the corporate authorities properly to administer the fund.

3d. The will does not bestow any bounty on *the poor*, and it is only by assuming that it does so, in contradiction with the legal definition of the term *charity*, which extends such donations to *the rich* as well as *the poor*, as already shown, that such a conclusion is arrived at.

4th. The appointment of the city as administrator of *Fink's* bequest is in direct opposition to the expressed intention of his will, wherein he delegates this power to trustees.

5th. There is no law authorizing the city to undertake the administration of this charity.

For these reasons, and for others, which, if we had time, might easily be assigned, it appears to us that the reasoning of the court, although exceedingly subtle and plausible, is based upon erroneous assumptions and has not the sanction of law for its support.

Under these circumstances, to deprive the plaintiffs, who are the heirs-at-law of the testator, (and as such entitled to all the property of which he has not legally disposed,) of their lawful inheritance, and to give the same to a wealthy corporation would, it seems to us, be neither just nor equitable. The construction which the court has adopted in the interpretation of this will appears to be founded entirely on ingenious conjectures, which have induced it to adopt the principle of *cy-près* which governs the English Courts of Chancery in their construction of charitable uses, but which, until the decision in the present case, has never been followed in any of the tribunals of the United States

The court has unquestionably the power to adhere to the decision already rendered, even if erroneous, but we are confident that no pride of opinion or of consistency will induce it to adhere to a judgment, although publicly declared, if we have succeeded in convincing it that it is an erroneous application and exposition of the law.

Re-hearing refused.